**AMERICAN HOME PRODUCTS CORP.**

v.

**The PROCTER & GAMBLE COMPANY, Syntex USA Inc., and Procter/Syntex Health Products Co.**

**Civ. A. No. 94–3843.**

United States District Court,
D. New Jersey.

Dec. 27, 1994.

---

Matthew P. Boylan, Veronica Smith Lewis, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, Stuart J. Land, Thomas J. McGrew, Arnold & Porter, Washington, DC, for plaintiff.

Andrew T. Berry, Peter J. Ganz, McCarter & English, Newark, NJ, Harold P. Weinberger, Jonathan M. Wagner, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for defendants.

POLITAN, District Judge.

This matter is presently before the Court on the application of plaintiff American Home Products Corporation for a preliminary injunction against defendants The Procter & Gamble Company, Syntex USA Inc., and Procter/Syntex Health Products Company seeking to enjoin advertising introducing defendants' new over-the-counter pain reliever known as "ALEVE." The Court conducted a six-day evidentiary hearing on plaintiff's application. For the reasons expressed herein, plaintiff's application is **DENIED**.

## I. Findings of Fact

### A. Procedural Background

This case involves a dispute between manufacturers and marketers of competing over-the-counter ("OTC") analgesic drugs. Plaintiff American Home Products Corporation ("AHP"), through its Whitehall–Robins Health Care Division, manufactures and sells for resale to consumers a variety of health care products including ADVIL®, an OTC analgesic containing 200 mg. of ibuprofen per tablet. Defendants Procter & Gamble Company ("Procter"), a consumer products company, and Syntex USA Inc. ("Syntex"), a pharmaceutical company, formed Procter/Syntex Health Products Company ("Procter/Syntex"), a general partnership which is in the business of manufacturing, advertising, promoting and marketing ALEVE®, an OTC analgesic containing 220 mg. of naproxen sodium.

On August 8, 1994, AHP filed this action, together with a motion for expedited discovery and a motion for a preliminary injunction. AHP seeks preliminary and permanent injunctive relief including corrective advertising, compensatory damages as well as an award of profits, damages, costs, and attorneys' fees, in order to redress alleged violations of the Lanham Act in connection with the advertising, marketing and promotion of ALEVE.

Specifically, the Complaint alleges that, in violation of § 43(a)(2) of the Lanham Act, 15 U.S.C. § 1125(a)(2), the advertising and promotion of ALEVE convey false and misleading claims including the claims that: (1) ADVIL is ineffective or significantly less effective than ALEVE, either in general or for headaches, muscle aches or arthritis pain; (2) many people who do not get enough pain relief from ADVIL will get better or more complete pain relief from ALEVE, either in general or for headaches, muscle aches or arthritis pain; (3) well-controlled clinical studies establish that ALEVE provides a high level of pain relief for 12 hours following painful dental surgery; (4) well-controlled clinical studies establish that ALEVE is more effective than ADVIL; (5) physicians recommend ALEVE in preference to ADVIL; (6) ALEVE has a longer duration of action than other OTC analgesics, including ADVIL; (7) ALEVE has a duration of action twice as great as ADVIL; (8) EXTRA–STRENGTH TYLENOL® has a longer duration of action than ADVIL; (9) well-controlled clinical studies establish that ALEVE has a greater duration of action than ADVIL; (10) ALEVE is the OTC version of NAPROSYN®; (11) NAPROSYN is "The number 1 selling prescription brand in its class"; (12) physicians prescribe the medicine in ALEVE more than the medicine in ADVIL; (13) persons 65 years of age and older may take ALEVE every 8 to 12 hours; (14) the duration of action of ALEVE, EXTRA–STRENGTH TYLENOL, ADVIL and BAYER® aspirin is proportional to the recommended dosage of each drug; (15) ALEVE provides pain relief in as little as 20 minutes; and (16) the efficacy of ALEVE has been confirmed in 32 clinical trials involving 2,857 patients.

At the hearing before this Court, AHP sought preliminary injunctive relief prohibiting *pendente lite* claims that (a) ALEVE relieves headache or other pain better than ADVIL; (b) ALEVE has a greater duration of action than ADVIL; (c) ALEVE works twice as long as ADVIL; (d) EXTRA–STRENGTH TYLENOL has a longer duration of action than ADVIL; (e) the recommended dosage of over-the-counter analgesic drugs is equivalent to their duration of action; (f) 32 clinical studies established the efficacy of ALEVE; (g) ALEVE is the over-the-counter version of the prescription drug NAPROSYN; and (h) persons over the age of 65 can safely medicate using the dosing

schedule permitted by law for persons under the age of 65.[1]

## B. Development and Introduction of ALEVE

OTC internal analgesics are manufactured and sold to the public for temporary relief of minor pain of headache, muscle aches, the minor pain of arthritis, and the pain of menstrual cramps. Prior to June 1994, aspirin, acetaminophen (the active ingredient in TYLENOL) and ibuprofen (the active ingredient in ADVIL) were the principal OTC analgesics available for sale to the U.S. consumer.

For the past 18 years, Syntex has manufactured and sold a prescription pain reliever under the brand name NAPROSYN. Tr. 1.195 (DeArmond).[2] The only active ingredient in NAPROSYN is a chemical compound known as naproxex. Tr. 1.195–96 (DeArmond). Like ibuprofen, the active ingredient in ADVIL, naproxex belongs to a class of pain relievers known as nonsteroidal anti-inflammatory drugs, or "NSAIDS."

Syntex also manufactures and markets another prescription pain reliever called ANA-PROX®, which contains the active ingredient naproxen sodium. The singular purpose of the sodium in naproxen sodium is to accelerate the body's absorption of naproxen. Once in the body, naproxen and naproxen sodium are identical, i.e., they behave the same way and have the same efficacy, except that naproxen sodium has a faster onset of analgesic effect than naproxen. Tr. 1.101–03 (Davis); 1.195–96, 1.199–200 (DeArmond); 4.139–40 (Benet).

In 1988 defendant Procter/Syntex set out to develop an OTC formulation based on naproxen. The company "[was] hoping to build on the heritage of [NAPROSYN], a drug that is well known, even better known than [Syntex's] ANAPROX brand...." Tr. 1.173 (DeArmond). In April 1992, Procter/Syntex filed a New Drug Application ("NDA") seeking approval from the Food and Drug Administration ("FDA") for OTC naproxen with a 6 to 8 hour dosing regimen. Tr. 1.199–200 (DeArmond); 4.182–84 (Feldman).

The FDA, however, was concerned that naproxen would have an onset of pain relief that was too slow for an OTC analgesic and requested that a new application be submitted proposing naproxen sodium (200 mg of naproxen and 20 mg of sodium per tablet or caplet) as ALEVE's active ingredient. Tr. 4.221–22 (Feldman). After conducting additional tests on naproxen sodium, Procter/Syntex resubmitted the NDA in December 1992, seeking FDA approval for an OTC version of ANAPROX (i.e., naproxen sodium) with a 6 to 12 hour dosing schedule. Tr. 4.184–85 (Feldman); Pl.Ex. 305.

In January 1994, the FDA approved this OTC version of ANAPROX, summarizing its basis for so doing in its official "Summary Basis of Approval" or "SBA." Def.Ex. 1. The FDA approved a dosing regimen of either one tablet (220 mg) every 8 to 12 hours, or an initial dose of two tablets (440 mg) followed by one tablet every 12 hours, with no more than three tablets every 24 hours. In explaining the rationale for this dosing regimen, the FDA declared in the SBA that

---

1. In addition, at the hearing on the motion, AHP sought preliminary injunctive relief prohibiting claims that "ALEVE may provide onset of relief in as fast as 20 minutes." This claim appeared in an advertisement published only in professional journals. See Pl.Ex. 214. Although the claim was asserted in plaintiff's Complaint, no notice of this claim was provided in plaintiff's motion for preliminary relief. Tr. 1.177. Plaintiff asserts that Procter/Syntex was in fact on notice that their 20 minute onset claim would be challenged because of several questions put to two witnesses during pre-trial depositions. Tr. 1.175. However, the fact that this subject was briefly broached during the voluminous discovery stage does not negate the fact that this claim was not made part of the instant motion. Moreover, the Court notes that defendants' counsel became aware of AHP's intention to litigate this claim only a few days prior to the commencement of the hearing. Accordingly, I presently decline to address this issue.

2. "Tr. __." references portions of the record of the hearing held before the Court on October 17–25, 1994. The prefix to the transcript reference indicates the volume of the transcript cited. The name of the witness is indicated in parentheses. "Pl.Ex. __" and "Def.Ex. __" reference exhibits introduced at trial by plaintiff AHP and defendant Procter/Syntex. References to a witness followed by a "Dep. __" are to pages of deposition testimony previously designated and supplied to this Court by the parties.

results from tests submitted by Procter/Syntex, known as LAB 982 and LAB 983, indicated that ALEVE had a "longer duration of action [than ibuprofen] supporting a BID–TID [twice a day—three times a day] dosing regimen." Def.Ex. 1, at C0051. Defendants are presently manufacturing and selling this drug under the trade name ALEVE.

## C. The Advertising Claims Challenged by AHP

### 1. Defendants' Print Advertising

It is useful at the outset to review plaintiff's objections to the ALEVE promotional campaign and defendants' responses thereto. Much of AHP's consternation regarding the ALEVE advertising centers on a colored bar graph that accompanies most if not all of defendants' print and display advertising for the product. *See, e.g.,* Pl.Exs. 206, 207, 214. The bar chart displays on its face the recommended dosing schedules for the OTC analgesics ALEVE, EXTRA–STRENGTH TYLENOL, ADVIL and BAYER aspirin; indeed, the dosing rather than duration nature of this chart is confirmed by the caption "Recommended Dosing" that accompanies the graph in nearly every setting in which it is presented.

The bar charts featured in these materials are comprised of colored bars that extend horizontally from left to right along an axis broken up by hourly time intervals. Each bar represents a separate product. The bar graph for ALEVE stretches out horizontally to the 12–hour point, EXTRA–STRENGTH TYLENOL extends to approximately the 8–hour point, ADVIL to the 6–hour point and BAYER aspirin to the 4–hour point. Pl.Exs. 206, 207, 211, 212, 213, 214. There is a color change or fading out of color toward the end of each of the bars in the bar chart. *Id.* In some presentations, to the left of the bar graph is the statement in large type "All day strong." Underneath the bar graph is the statement "That means you could work all

day or sleep all night without being interrupted by pain." *See, e.g.,* Pl.Ex. 206.[3]

AHP does not profess that the ALEVE print advertising contains explicit words claiming superior duration of action over competing analgesic drugs. Nevertheless, it is AHP's contention that the intended message of the bar chart is that ALEVE has a longer duration of action—twice as long in fact—than does ADVIL ·and that EXTRA–STRENGTH TYLENOL has a longer duration of action than does ADVIL. These messages, according to AHP, are communicated mainly by the comparative length of the bars. AHP also claims that these purported duration messages are fortified by the proximity of the dosing chart to duration claims (*e.g.,* "all day long, all day strong" and "longer than EXTRA–STRENGTH TYLENOL") and the graphics chosen for the color bars.

AHP also takes issue with the free-standing insert ("FSI"), a full page color advertisement promoting ALEVE and containing a coupon, that was distributed in Sunday newspapers nationwide, initially in August 1994 and again in September 1994 after this action was filed. Malkoski Dep. at 188:10–188:20, 190:6–190:10. In the case of a national product launch, the FSI is one of the first advertisements a consumer is likely to see for the new product. Tr. 1.42 (Davis). Makers of OTC analgesics typically use FSIs in their advertising because it is an effective way to communicate with a large number of consumers at one time. Toomey Dep. at 25:23–26:10.

AHP asserts that the ALEVE FSI explicitly seeks to link ALEVE's dosing and duration of action. A paragraph in the FSI under the heading "All day long" states as follows:

> ALEVE is the only non-prescription pain reliever with 8 to 12 hour dosing. Just one ALEVE tablet or caplet gives you long-lasting relief that can last up to 12 hours.

---

3. A drug's duration of analgesia and its dosing schedule are two separate concepts. Dosing refers to the time interval between administrations of the drug by the consumer. Dosing instructions are set forth on the product's label and refer to the minimum length of time between

doses of the drug without a physician's order. On the other hand, when referring to an internal OTC analgesic, duration refers to the length of time the consumer obtains pain relief. Tr. 1.57 (Davis).

Pl.Ex. 206. The ALEVE FSI contained a bar chart in its center. In the FSI, the phrases "All day strong" and "All day long" appear in large type just above the bar chart; "All day strong" and "All day long" appear to the left of the bar chart; the language "[t]hat means you could work all day or sleep all night without being interrupted by pain" appears just below the bar chart; and the phrases "All day strong" and "All day long" appear adjacent to the bar chart. Id.[4] Defendants represented to the Court at the hearing that the FSI at issue here has been discontinued and that this particular FSI will not reappear in its present form. Tr. 1.22; 6.184–185.

Procter/Syntex began mass media print advertising to consumers in June 1994. An ALEVE consumer print advertisement appeared in the New York Times and numerous magazines of widespread circulation in July 1994. Pl.Ex. 207; Toomey Dep. at 39:5–39:15. The New York Times print advertisement reads in full:

> Before you take Tylenol or Advil again, get a second opinion. Introducing the only non-prescription pain reliever with 8–12 hour dosing. New Aleve. The first pain reliever with the non-prescription strength of Anaprox, a fast-acting form of the medicine in Naprosyn. The #1 selling brand in its class for 10 years. The brand doctors have prescribed over 150 million times, outselling Motrin and all other prescription ibuprofen brands combined. Aleve is longer-lasting than Extra–Strength Tylenol. Advil isn't stronger. Yet Aleve is gentler to your stomach lining than aspirin. And because the maximum daily dose for Aleve is only 3 pills, compared to 12 aspirin, Aleve won't upset your budget. In fact, Aleve costs half as much as Tylenol or Advil per maximum daily dose. Try new Aleve. To take pain away and keep pain away all day.

Pl.Ex. 207. In addition, this printed ad contains the bar chart as well as the slogan "All day strong all day long." AHP claims that the New York Times print advertisement implies the same purportedly false messages as the FSI and the ALEVE television commercials. Tr. 1.65–66, 1.72–73 (Davis).

In addition, the ALEVE promotion extended to medical journals. The language "Introducing ALEVE the only OTC analgesic with" appears as a preface to "The endurance of 8–12 hour dosing" in the health professional advertising. Pl.Exs. 213, 214. The ALEVE bar in that chart is labeled "ALEVE offers the convenience of 8–12 hour dosing," whereas the bars in the chart for the other drugs state that the referenced drug "recommends" its dosing regimen. Moreover, the following introductory language also appears in the ALEVE professional advertising:

> The activity of naproxen sodium
>
> The efficacy of ALEVE has been confirmed in 32 clinical trials involving 2,857 patients.

Pl.Ex. 214 (footnote omitted). AHP's chief complaint with respect to the advertising addressed to medical professionals concerns the claim that 32 clinical studies has proven the efficacy of ALEVE.

## 2. Defendants' Television Advertising

Defendants commenced television advertising for ALEVE in early July 1994 with four commercials that are virtually identical. See Pl.Ex. 208 (entitled "Talking About His Wife"); Pl.Ex. 208a (entitled "Her Brother Needs Aleve"); Pl.Ex. 208b (entitled "Talking About Her Husband"); Pl.Ex. 208c (entitled "Mom Needs Strong Medicine"). Each commercial contains two references to AD-VIL. The initial reference to ADVIL is sandwiched between statements about TYL-ENOL and aspirin: "when the pain lasts longer than the TYLENOL, when you've tried the ADVIL, and aspirin upsets your stomach, ..." The latter mention of ADVIL ("ADVIL isn't stronger") is made between claims of ALEVE's superiority over EX-TRA–STRENGTH TYLENOL and ALEVE's superiority over aspirin. Each commercial states:

> Only ALEVE has 8 to 12 hour dosing. It lasts longer than EXTRA–STRENGTH

4. In addition, a "gravity-fed" product dispenser (Pl.Ex. 100) also contains the bar chart referred to herein. The dispenser, a type of "display vehicle" used in retail outlets, draws attention to the product and provides key messages about the product to the consumer. Tr. 1.43–44 (Davis).

TYLENOL. ADVIL isn't stronger, yet ALEVE is gentler to your stomach lining than aspirin.

Pl.Exs. 208, 208a, 208b, 208c. During the commercials, a visual of a medicine cabinet with the three competing drugs is shown. Each of the drugs is discarded from the medicine cabinet as the narrator refers to it. *Id.*

AHP contends that by their language and presentation, the ALEVE commercials falsely imply that ALEVE is more effective than ADVIL and has a longer duration of action than ADVIL, as well as conveying false messages concerning the prescription heritage of ALEVE. In addition, AHP claims that the commercial "Mom Needs Strong Medicine" (which uses an actress who plaintiff contends appears to be over the age of 65) also communicates false messages with respect to the ability of those over 65 years of age to take ALEVE using the 8 to 12 hour dosage regimen applicable only to those under 65.

In contravention to the claims of false or misleading advertising, Procter/Syntex asserts, with respect to both its print and television promotions, that the ads make no explicit superiority claims against ADVIL. Defendants direct the Court's attention to a July 1994 memorandum authored by AHP and addressed to the Vice President for Commercial Standards at the American Broadcasting Company. Def.Ex. 31. While the document is intended to justify AHP's slogan that "Nothing has been proven to last longer than ADVIL," AHP also acknowledged therein that:

Whatever the recent P & G/Syntex Aleve newspaper ads and TV commercials might *imply,* they have been careful to avoid any *explicit* claim of greater duration or efficacy than Advil. For example, in the full page ad introducing Aleve that appeared in many newspapers on June 24, P & G said: "Aleve is longer-lasting than Extra–Strength Tylenol. Advil isn't stronger . . ." The recent set of Aleve TV commercials said the same thing. In both cases, P & G/Syntex do make an explicit claim of greater duration than Tylenol but claim no more than equality with Advil.

Memorandum of AHP to Harvey Dzodin, Vice President—Commercial Standards, Capitol Cities ABC (July 7, 1994) (footnotes omitted). In addition, defendants also point to the testimony of AHP's Andrew Davis, Senior Vice President of Marketing for the Whitehall–Robins division of AHP, which they claim concedes that ALEVE's advertisements make only a parity claim against ADVIL and that none of the challenged claims are literally false. Tr. 1.87, 91–93 (Davis). Indeed, Mr. Davis testified that "[i]n terms of explicit claims, there is not an explicit claim that goes beyond equality with ADVIL." Tr. 1.93 (Davis).

Moreover, Procter/Syntex states that no ALEVE promotional material claims that the product has a longer duration or greater efficacy than ADVIL. Rather, defendants affirm that nearly all their advertising contains explicit superiority claims against EXTRA–STRENGTH TYLENOL and aspirin with only a so-called "parity" claim with ADVIL. As to the bar chart mentioned above, defendants claim that the chart accurately reports the recommended dosing schedules for ALEVE, EXTRA–STRENGTH TYLENOL, ADVIL and BAYER.

Thus, having set forth the basic claims and defenses presented in this case, the Court commences its review of the rather extensive survey and clinical evidence before it.

### D. Survey Evidence

As part of its efforts to demonstrate that the ALEVE advertising is misleading, AHP relied on two consumer surveys conducted by the research firm of Audits and Surveys. Dr. Donald Pace, Senior Vice President of Audits & Surveys, testified as plaintiff's survey expert. He conducted separate surveys of the ALEVE FSI (Pl.Ex. 206) and one of the ALEVE television commercials. Pl.Ex. 208c; Tr. 4.3–6; 4.12; 4.50 (Pace).

#### 1. The FSI Survey

Audits & Surveys was retained by plaintiff's counsel in May 1994 to do a survey on the FSI. The firm recommended that the full national survey consist of about 500 mall intercept interviews in geographically dispersed markets throughout the country and that a pilot test be conducted first to assure

that the questionnaire would be easily understood by consumers and easy to administer. Plaintiff's counsel accepted this recommendation. Tr. 4.7–10 (Pace).

Dr. Pace was present on the first day of the pilot study and observed approximately 15 interviews. He concluded that the questionnaire was workable and recommended that the draft questionnaire be used, without any changes, in the national study. This recommendation was accepted, and the national survey on the ALEVE FSI was conducted in late June 1994 in malls in 10 cities across the country. Tr. 4.12–13 (Pace). The parties' experts both testified that the use of malls is an acceptable way of obtaining a survey sample and is a method frequently used in the market research industry. Tr. 4.15 (Pace); Tr. 6.107 (Rappeport).

The national survey conducted by Audits & Surveys on the ALEVE FSI included 522 consumers who had purchased or used an over-the-counter analgesic in the past year. All 522 interviews were "validated" by contacting each participant by telephone after the survey was completed to confirm that the interviews had been conducted. Tr. 4.15–19 (Pace).

During the course of the actual survey, defendants' FSI remained available to each survey respondent if she or he desired to look at it in responding to the survey questions. AHP claims that this practice was intended to simulate reality because a consumer has the opportunity to read or examine an FSI as long as she or he wishes. According to AHP, allowing respondents in the survey to refer to the FSI was an appropriate procedure and enhanced the survey's ability to ascertain the messages conveyed to consumers by the FSI. Tr. 4.21 (Pace).

The questionnaire in the FSI survey consisted of nine questions, some of which had several subparts. See Pl.Ex. 801. For example, questions 1 through 4 of the FSI survey were open-ended questions that did not direct the respondents to any particular subject in the FSI. Each of questions 5 through 8 was a directed open-ended question, asking what the FSI communicated about a comparison between ALEVE and another drug. In three of these questions,

the other drug was one shown in the bar chart—EXTRA–STRENGTH TYLENOL, ADVIL, and BAYER. In the fourth, the other drug was EXCEDRIN, which is one of the drugs shown on the shelf in the FSI but is not included in the bar chart. The EXCEDRIN question was designed to serve as a control question designed to measure whether consumers were paying attention to the survey questions and the FSI and responding to the survey questions only on the basis of what the FSI was communicating to them. Questions 5 through 8 also included subparts (asking "Why do you say that?") that were intended to probe the precise source in the FSI of any messages that consumers stated the FSI was conveying to them. Question 9 was identical to questions 5 through 8, except that question 9 asked if the FSI was communicating anything about EXTRA–STRENGTH TYLENOL in comparison to ADVIL. Pl.Ex. 801; Tr. 4.22–26 (Pace).

After reviewing the testimony of Dr. Pace and of Dr. Michael Rappeport, defendants' survey expert, as well as the documents submitted in connection with the survey evidence, it is the conclusion of this Court that little weight can be given to plaintiff's survey with respect to the FSI. It is true that Dr. Pace submitted an exhibit—Plaintiff's Exhibit 808—that listed verbatim responses to all of the survey questions showing that 68% of respondents in the FSI survey took away the message that "ALEVE relieves pain longer than ADVIL." It is also true that Plaintiff's Exhibit 809 showed that 58% of the participants purportedly received a message that EXTRA–STRENGTH TYLENOL relieves pain longer than ADVIL. However, the Court discounts the reliability of those figures and instead credits the testimony of Dr. Rappeport, who criticized the survey's validity because the FSI being tested was left in front of the participants for their reference while they were asked repeatedly to interpret it. Tr. 6.95 (Rappeport).

An examination of the FSI survey reveals that it set forth, *inter alia*, the following questions, some of which were followed by additional probes:

1. First, in your own words, what do you think is the main point of this advertisement?

2. What else, if anything, does the ad say to you? (PROBE: What else does it say).

3. What, specifically, does this ad tell you about ALEVE?

4. What else, if anything, does this ad tell you about ALEVE?

Pl.Ex. 801. While these questions are not explicitly suggestive, their continued repetition over a period of 10 to 15 minutes while the FSI is in front of the participant allows her to project additional answers until she gave the interviewer what she felt that individual wanted to hear. Tr. 6.94–97 (Rappeport). In other words, the Court finds that while the aforementioned questions do not specifically ask if ALEVE has a greater duration than ADVIL, they do request the participant to continually reexamine and reinterpret the FSI to, in effect, determine if she "missed something." However, as Dr. Rappeport testified, consumers do not normally meditate over an FSI's details for any appreciable length of time; the ad is simply meant to give a dramatic effect and/or to communicate a "quick" message. Tr. 6.96 (Rappeport). Indeed, even Dr. Pace himself stated that the FSI survey did not simulate real-life conditions under which consumers read coupon inserts. Tr. 4.88 (Pace).

Thus, when survey participants were asked 4 separate times what were the messages of the FSI, only 12 participants (approximately 2%) responded that ALEVE lasted longer than ADVIL. Pl.Exs. 804, 827; Tr. 4.91–93 (Pace). It was only when they were asked "what, if anything, does this ad tell you about ALEVE in comparison to ADVIL"—a question that itself was repeated 4 times and which explicitly suggested that the participants make a comparison—did the survey produce its 68% response. Accordingly, the Court finds that this repetitive manner of questioning, when coupled with the extended study time of the FSI permitted each participant, produced results that cannot be relied upon in ascertaining whether consumers received implicitly misleading messages.

## 2. The Television Commercial Survey

Dr. Pace also conducted a shopping mall survey of the ALEVE television commercial. This survey took place in mid-August 1994 among 491 consumers who had purchased or used an over-the-counter analgesic in the past year. Questions 1 and 2 were nondirected open-ended questions, while questions 3–6 asked whether consumers recalled having heard or seen EXTRA–STRENGTH TYLENOL, ADVIL, aspirin or EXCEDRIN in the commercial, and, if so, the messages conveyed about each. As in the FSI survey, these questions were rotated and the EXCEDRIN question was included as a control. Pl.Ex. 813; Tr. 4.50–56 (Pace). Question 7 in the television survey was a multiple-choice question intended to ascertain what percentage of consumers believe that the mother in the commercial is a senior citizen. The results showed that approximately 50% of respondents viewed her as a senior citizen. Tr. 4.56–58 (Pace); Pl.Ex. 816, Table 9.

In preparation for this litigation, Dr. Pace prepared an exhibit—Plaintiff's Exhibit 820—which addressed the message "ALEVE Relieves Pain Longer than ADVIL" and showed that 30.3% of the respondents received this message from the ALEVE commercial. Tr. 4.68 (Pace); Pl.Ex. 820. He also prepared Plaintiff's Exhibit 824, which listed participants who took away the message that "ALEVE relieves pain more effectively than ADVIL (non-duration)" from the ALEVE commercial. The exhibit purports to show that the television commercial communicated a superior efficacy message to 35.6% of the respondents. Tr. 4.69–70 (Pace); Pl.Ex. 824.

Dr. Pace netted the 30.3% and 35.6% shown in Plaintiff's Exhibits 820 and 824 to calculate the overall percentage of respondents taking away either or both of the messages of ALEVE's superior duration and efficacy over ADVIL. He testified that more than half (specifically 53.6%) of all respondents indicated that they had received either the message "ALEVE relieves pain longer than ADVIL" or "ALEVE relieves pain more effectively than ADVIL (non-duration)," or both, from the ALEVE television commercial. Tr. 4.71–72 (Pace); Pl.Ex. 826. Dr.

Pace further opined that the results from the EXCEDRIN control question, as in the FSI survey, should provide confidence that the respondents were paying attention to the questions asked and the ALEVE advertisement and were responding only on the basis of what the commercial conveyed to them. Tr. 4.70–71, 4.110 (Pace).

The Court finds that Dr. Rappeport, defendants' survey expert, offered no meaningful criticism with respect to the questionnaire that Dr. Pace employed or with the manner in which the commercial was shown to survey participants. However, Dr. Rappeport found the television survey fundamentally flawed in that it lacked adequate controls to measure what is known as "noise"—that is, preconceptions, unrelated misinformation, and simple guessing. As Dr. Rappeport testified, a survey in a false advertising case should typically distinguish between the participant's prior knowledge and/or prior (mis)conceptions regarding the product before seeing its advertisement from any effect due to that advertisement alone. Tr. 6.100–104 (Rappeport).

Plaintiff states that it makes no allegation that defendants' advertising is exploiting an existing consumer preconception so that its surveys are not required to contain a control mechanism whereby consumer preconceptions may be established. See Pl.Br. at 89. However, this assertion does not vitiate Dr. Pace's admission that a survey in an action such as this should provide some sort of filter for preexisting noise. Tr. 4.108–109 (Pace). Indeed, an internal AHP memorandum warns that "[b]ecause ALEVE is both new and an RX to OTC switch (with all the superior efficacy perceptions that that may generate), ADVIL should consider reinforcing its positioning equity of '*advanced* medicine.'" Def.Ex. 48. Given these statements, it is clear that despite their protestations to the contrary, plaintiff does in fact recognize that a survey addressed to an analgesic commercial must properly control for preconceptions (both accurate and inaccurate) that con-

sumers may possess given their continual exposure to OTC products and advertising.

Thus, the Court must determine whether the control employed in Dr. Pace's television commercial survey acted as a proper filter such that these preconceptions would not skewer the survey's results. As noted above, AHP claims that the question directing the participant to tell the interviewer what the commercial told her about EXCEDRIN was an effective means to ascertain whether the participant paid careful attention to the ad in question. This may well be so. But this question does nothing with respect to accounting for the individual participant's preconceived notions concerning OTC analgesics and how those notions may have influenced her responses. While Dr. Pace testified that the EXCEDRIN control revealed only that the participants were "awake" and "attending to the question you have asked," he specifically remarked that the question could not detect any consumer preconceptions regarding analgesics. Tr. 4.110–112 (Pace). Accordingly, the Court must discount AHP's contentions that (1) approximately 30% to 35% of survey participants received a message of ALEVE's superior duration and efficacy over ADVIL, and that (2) 53% took away the message that ALEVE relieves pain longer and/or more effectively than ADVIL, as being unreliable given the lack of an appropriate control.

To buttress this conclusion the Court notes with approval two surveys conducted by Dr. Rappeport which illuminate the existence of the (unaccounted for) noise in the AHP survey. In the first survey, consumers were asked via telephone how long various OTC analgesics lasted without the benefit of any advertising copy to review.[5] Of particular importance to the present discourse is Dr. Rappeport's finding that just about half of the survey participants responded that the analgesic effects of ADVIL lasted from 2 to 6 hours, with only 9% saying that ADVIL lasted greater than 7 hours. The expert testified, and this Court agrees, that these results

---

5. The questions put to the telephone survey participants were: "(1) How long do you think aspirin lasts; (2) How long do you think TYLENOL lasts?; (3) How long do you think Advil lasts?; (4) How long do you think Excedrin lasts?" Tr.

6.115 (Rappeport). The order of the questions were rotated to preclude any argument that answers obtained were the result of the order in which the questions were asked.

reveal that a significant number of consumers have a general preconception as to ADVIL's duration that is not informed or influenced by any ALEVE advertisement. Tr. 6.117–118 (Rappeport). In addition, the Court notes a second Procter/Syntex survey performed by Dr. Rappeport in which over 40% of the survey participants who viewed a recent ADVIL commercial indicated that they saw specific superiority claims that ADVIL lasted longer, acted faster, and was gentler to the stomach than another analgesic when in fact those specific claims were not advanced in the advertisement.[6] Def.Ex. 86; Tr. 6.109–114 (Rappeport). When viewed together, these two surveys show that noise (in this case, preconceptions regarding an analgesic's duration and/or efficacy) may exist and may be seen by consumers even where such claims have not been asserted. Since the survey conducted by AHP's expert did not account for these preconceptions, the responses garnered by plaintiff's survey are nonprobative of the effect of the ALEVE commercial on consumers.

### 3. Inapplicability of the AHP Surveys to Procter/Syntex's other Print Advertising

AHP's Dr. Pace also testified that, in his professional opinion, the data from the FSI and ALEVE television commercial surveys provide evidence that messages of ALEVE's superior duration and efficacy over ADVIL are being communicated to many consumers by the ALEVE *New York Times* print advertisement. Tr. 4.35; 4.68–69; 4.120–21 (Pace). The expert identified three principal elements in the print advertisement that are common to the FSI, the television commercial, or both. These common elements are (a) the bar graph; (b) the language concerning ALEVE's 8–12 hour dosing; and (c) the language immediately to the right of the bar graph in the *New York Times* print advertisement that is identical to language contained in the television commercial. Tr. 1.76 (Pace). AHP contends that Dr. Pace's testimony on this point should be credited because the print advertisement combines key

elements of the FSI and ALEVE television commercial as to which survey data have been obtained.

This Court has already determined that the FSI and television surveys conducted by AHP were not reliable. However, assuming *arguendo* that those surveys were accepted by this Court, Dr. Pace's opinion testimony that the surveys provide evidence that other ALEVE print ads are misleading is not the benchmark by which the Court must determine whether consumers were in fact deceived. If defendants' *New York Times* advertisement was in fact misleading to the public, a well-designed consumer survey will so demonstrate. However, in this case AHP did not commission any survey directed to any ALEVE print advertisement other than the FSI. Tr. 4.82–86 (Pace). While AHP argues that the common elements of the FSI and the other print ads make an extension of the survey's applicability natural, this contention flies in the face of Dr. Pace's own testimony that any opinion concerning the message conveyed by a print advertisement would be, in the absence of a consumer survey, merely "informed speculation." Tr. 4.82–85 (Pace). Thus, since plaintiff failed to perform consumer surveys on any piece of advertising other than defendants' FSI and one of its television ads, the Court must reject its argument that the data accumulated from the aforementioned surveys, even if probative, have any relevance to any of defendants' other advertising other than the FSI or television commercial.

### E. Intent to Deceive or Mislead

AHP further contends its evidence shows that Procter/Syntex intended to imply via comparisons of dosing label instructions that ALEVE has a longer duration of action than ADVIL. As evidence of this intent AHP introduced, *inter alia*, the comments of Grif Bates, Procter & Gamble's ALEVE brand manager, to a gathering of the National Sales Meeting, wherein he stated:

6. The ADVIL commercial tested contained a superiority claim against one OTC analgesic (*i.e.*, "I found that on my tough headaches two ADVIL are better than two EXTRA–STRENGTH TYLE-

NOL") as well as a specific parity claim (*i.e.*, "nothing is proven to last longer than ADVIL"). See Def.Ex. 86.

Now that we have established that Aleve is a breakthrough [*sic* ] product, let me briefly take you through our plans to ensure that we have a first rate marketing program to support it. First and foremost, our overall marketing strategy is to establish a superior efficacy positioning versus competition. Overall efficacy, making pain go away, and stay away, is the #1 consumer need in this category. We will communicate this to consumers by leveraging three key competitive advantages: 1) The Rx heritage of Naprosyn, the #1 selling brand in its class; 2) our 8–12 hour dosing (versus 4–8 for other brands) will communicate an overall efficacy advantage; and 3) Aleve lasts longer than competition, and duration of pain relief is a key aspect of overall relief. By convincing consumers that Aleve relieves pain better than Tylenol, better than Advil, no matter what the pain—headache, arthritis, muscle aches—we will more than exceed our share objectives. Secondary to our focus on product efficacy, we will also clearly communicate to consumers our benefits in two other important areas; value and safety. On the value front, since Aleve will be parity priced to Advil, yet allow consumers longer duration between doses, it will represent a better value than what is available today.

After explaining this marketing strategy, Mr. Bates showed the sales force "three different commercials which we'll use at launch that we feel exemplify our positioning to consumers in the marketplace." Pl.Ex. 333A, at A006637; Pl.Ex. 333.

AHP asserts that this strategy is described in and confirmed by numerous Procter/Syntex documents. As early as December 1991, for example, Dr. Mitra, the head of Product Development at Procter, wrote in his Health Care Product Development Division Analgesic Section Monthly Report, "[i]n developing [ALEVE] claims we plan to leverage Naproxen's excellent balance of safety and efficacy to convey an overall [*sic* ] 'superior medicine' image. Our current strategy is to achieve this by ... identifying ways to claim superiority in ... duration vs. ADVIL...." Dr. Mitra explained, "[o]ur offensive strategy in the efficacy area must be based on conveying a superior efficacy image by utilizing

[ALEVE's] duration advantage...." Pl.Ex. 375.

In addition, in January 1994, Mr. Bates summarized the "ALEVE Introductory Marketing Plans" for his supervisor Ms. Malkoski. Under "Marketing Strategies," he wrote, "[w]e will utilize the following strategies to achieve our business objectives: 1. Establish a superiority positioning versus competition by leveraging key competitive advantages: ... 8 to 12 hour dosing versus 4 to 8 hour for other brands (communicating overall efficacy)." Under "Marketing Plans," Mr. Bates wrote, "Brand Positioning—The brand will be positioned to consumers as delivering superior efficacy versus competition by not only taking pain away, but keeping it away all day. We will support our benefit via our distinctive '8–12 hour dosing' versus competitions '4–8 hour dosing' ..." He also notes that "[t]he ALEVE carton ... prominently features copy to emphasize our duration story (8 to 12 HOUR DOSING)." Pl.Ex. 399A, at A002265, A002267.

From its review of plaintiff's evidence, the Court notes that the proofs as to defendants' overall marketing strategy could possibly evince their intent to establish a superior marketing position via use of ALEVE's dosing regimen. The Court, however, also notes defendants' assertions that with respect to consumer advertisements, the dosing chart was employed as a means of "communication about the convenience of the dosing regimen of [ALEVE]." Malkoski Dep. 54. Defendants claim they deliberately refrained from proffering a superiority claim against ADVIL in their launch promotions; at most the ALEVE marketing documents reveal that Procter/Syntex would like to have made such a claim or that it is considering doing so in its post launch or "Year II" advertising, if clinical results would support this. Malkoski Dep. 36–37; Pl.Ex. 309; Pl.Ex. 945. Such strategizing about proposed future ads, say Procter/Syntex, does not shed any light that would illuminate defendants' intent with respect to the launch advertising currently at issue.

However, even if I were to find that plaintiff's evidence establishes defendants' intent

to mislead, under recent Third Circuit precedent this finding is insufficient to warrant the grant of injunctive relief. I must also determine that the defendants' conduct rose to "egregious proportions." *See Johnson & Johnson–Merck v. Rhone–Poulenc Rorer,* 19 F.3d 125, 132 (3d Cir.1994). In the instant case, after hearing the testimony and reviewing the relevant submissions of both parties, I am simply unpersuaded that any intentions Procter/Syntex may have evinced with respect to the ALEVE marketing strategy approached the type of egregious conduct required by the Third Circuit to shift to defendants the burden of disproving that the ads convey misleading messages. Accordingly, I find that plaintiff's proofs do not show any intent to mislead the public on the part of defendants that rise to that requisite level of egregiousness.

**F. Defendants' Purported Claims of ALEVE's Superior Duration and Effectiveness over ADVIL**

It is AHP's contention that defendants' bar chart communicates to consumers that ALEVE lasts twice as long as ADVIL, *i.e.,* 8 to 12 hours versus 4 to 6 hours. Plaintiff asserts that it has proven on the basis of studies performed by Syntex comparing the duration of action of the two drugs that ALEVE and ADVIL do not differ in duration of action or effectiveness to a statistically significant degree such that defendants' purported claims of superior duration and effectiveness are literally false.

As the Court has discounted the reliability of plaintiff's surveys, it is patent that plaintiff can adduce no proof, other than its mere contention, that consumers received any messages of durational or efficacy superiority from the ALEVE promotional campaign.[7] However, even if this were not the case, I simply cannot find, based on the proofs before me, that AHP has established that a claim that ALEVE last longer or is more effective at the late hours than ADVIL is literally false.

**1. The Clinical Evidence**

The scientific testimony in this case centered around three Syntex clinical studies (LAB 982, LAB 983, and LAB 990) which compared ALEVE and ADVIL in what are known as "dental pain" studies. The dental pain model is a very sensitive pain model for testing analgesics such as ibuprofen and naproxen. Tr. 3.12; 3.18–19 (Barr). The Syntex studies used the same standard methodologies and analyses often used by AHP, by AHP's experts as well as by other analgesic manufacturers in their own dental pain studies. Tr. 5.126–29 (Landis). Hence, it is undisputed that the Syntex model contained the characteristics of an ideal pain model and that the results of such studies extrapolate well to clinical experience. Tr. 2.96–97 (Cooper).

Defendants' witnesses have conceded the fact that their clinical studies do not provide "conclusive proof" that naproxen sodium is longer lasting or more efficacious than ibuprofen. Tr. 1.190; 1.203–04 (DeArmond); Tr. 5.78–80 (Zabrowski). Defendant Syntex even informed the FDA that it "cannot use the proposed ADVIL claim, '. . . lasts longer . . . than the ADVIL . . .' because there isn't sufficient data to support this claim if litigated." Pl.Ex. 353, at A002157. However, the defense witnesses did indicate that the results of those tests suggested that ALEVE was in fact longer lasting than ADVIL at the later hours. *Id.*

Given Procter/Syntex's aforementioned admission, it is apparent the parties do not dispute that defendants have adduced no clear proof to buttress any possible claims of superior duration and/or efficacy. This concession is of no significant moment, however, since (as will be discussed *infra* ) the burden remains squarely on plaintiff throughout the case to prove affirmatively that such duration and efficacy claims are both present in the

---

7. In addition, the Court reiterates that the effect that the bar chart may have had on consumers with respect to defendants' other print advertising is similarly unknown, since (1) AHP did not perform consumer testing with respect to other print ads and (2) even Dr. Pace acknowledged

that he decided not to test the bar chart alone because it is inappropriate to "pull something out of an ad and then try to draw conclusions as to what that would mean if you put it in the context of the ad . . ." Tr. 4.81–82 (Pace).

challenged advertising *and* are false, not merely unsubstantiated. As noted, there has been no reliable proof that consumers have taken away duration and/or efficacy messages from defendants' ads. In addition, after careful review of the clinical evidence, the Court finds that the results of the Syntex pain studies do suggest that doses of naproxen sodium lasted somewhat longer and were somewhat more effective than equally potent doses of ibuprofen at the late hours. While the Court recognizes that the evidence on this late-hour duration and efficacy issue is underwhelming, it is nonetheless sufficient to preclude reliance on the Syntex studies to prove, as AHP has sought to do, that ALEVE and ADVIL have the same (or, non-significantly different) duration of action.

The Court proceeds to its review of the Syntex dental pain studies. Study 982 was designed to compare the safety profile and onset and duration of action of naproxen sodium, ibuprofen, and a placebo. Def.Ex. 2, at A000008. This study was a single dose study comparing the effect of one tablet of 220 mg of naproxen sodium (*i.e.*, ALEVE) with a 200 mg dose of ibuprofen (*i.e.*, ADVIL) and a sugar pill on various subjects following dental impaction surgery of one or two molars. As the parties have differed as to the conclusions reached by this and indeed all the studies, I find it best to restate the pertinent conclusions reached by this survey and summarized in its Discussion section:

> Naproxen sodium and Advil were comparable in onset of analgesic action, with no trend indicating an advantage of one active medication over the other. However, after hour 1 through the end of the 12 hours, a consistent trend showed numerical superiority for naproxen sodium over Advil. At 12 hours, the difference was statistically significant in favor of naproxen sodium. No other significant difference was found during the study. The clinical relevance of this trend is unknown, but it suggests that naproxen sodium offers analgesia for a longer period of time than Advil.

**8.** The time to remediation is the period from the time the treatment drug is first given until the patient finds pain relief sufficiently low that she

CONCLUSIONS

Each of the two active drugs, naproxen sodium 220 mg and ibuprofen 200 mg, were superior to placebo in analgesic efficacy. The two active drugs were of comparable efficacy. For duration of effect and overall efficacy, there was a trend in favor of naproxen sodium 220 mg over ibuprofen 200 mg.

*Id.* at A000023–24.

A review of the study showed that for the efficacy measurement of hourly pain relief (known as "PAR"), a general trend favored naproxen sodium over ibuprofen from hour 2 through to hour 12. *Id.* at A000039. In addition, naproxen sodium established a favorable general trend with respect to the pain intensity differential (in the parlance, "PID"). *Id.* at A000037. Moreover, with respect to time to remediation,[8] the results demonstrated a general trend favoring naproxen sodium. *Id.* at A000043.

Syntex's study LAB 983 was another single-dose dental impaction study comparing 2 naproxen sodium tablets (220 mg) with 2 ibuprofen tablets (200 mg) and a placebo to again determine the drugs' relative duration of action. Def.Ex. 3, at A000489. The finding of LAB 983 were summarized as follows:

> Naproxen sodium and Advil were comparable in onset of analgesic action, with no trend indicating an advantage of one active medication over the other. A numerical trend favoring naproxen sodium over Advil was seen, beginning at 1 hour for PIDs and at 5 hours for relief scores. Between 8 and 12 hours, naproxen sodium was significantly superior to Advil. The clinical relevance of the trend during the first 8 hours is unknown, but it suggests that naproxen sodium may offer better analgesia during this period than Advil. The significant differences observed from 8 through 12 hours indicate that naproxen sodium provides analgesia for up to 12 hours and lasts longer than Advil.

chooses to take a back-up medication. Tr. 3.23 (Barr).

## CONCLUSIONS

Naproxen sodium 440 mg and ibuprofen 400 mg were superior to placebo. The two active treatments were similar in onset of analgesic activity, but naproxen sodium 440 mg tended to have a longer-lasting action than ibuprofen 400 mg.

*Id.* at A000503.

As noted, in this study a trend favoring naproxen sodium over ibuprofen with respect to the PID score ran from hour 2 to hour 12 of the study, while the PAR scores favored naproxen sodium from the fifth hour to the close of the study. *Id.* at A000514, A000515, A000516. As in LAB 982, naproxen sodium fared better than ibuprofen with respect to back-up medication usage, with a favorable naproxen trend becoming visible at approximately the third hour of the study. *Id.* at A000520.

The objective underlying LAB 990 was to determine the relative duration of single doses of naproxen sodium (440 mg) and ibuprofen (400 mg) with placebo over a 12 hour period. Def.Ex. 5. This study showed inconclusive results on both the PID and PAR data graphs during the early hours, but a general trend favoring naproxen sodium was established on the PID graph at hour 8 and continued through hour 12, while a favorable naproxen sodium trend on the PAR scale could be seen at hour 7 and only became greater as hour 12 approached. *Id.* at A014553, A014552. While the median time to remediation in this study, unlike in LABs 982 and 983, favored ibuprofen (*id.* at A014555), the study concluded that the 2 drugs did not differ significantly on any primary or secondary variable with the notable exception that "naproxen sodium 440 mg was superior to ibuprofen 400 mg on the 11– and 12–hour VAS PID and pain relief scores." *Id.* at A014549.

I find, in consonance with defendants' own witnesses, that the trends are not of sufficient statistical difference to establish *defini-*

*tively* any superior duration claims. However, it is patent from the Court's own examination of the foregoing studies, as well as from the testimony both from Syntex's Medical Director Dr. DeArmond, and Procter/Syntex's clinical expert, Dr. Bloomfield, that the consistent trends of all 3 studies strongly suggest that naproxen sodium, that is, ALEVE, has a longer duration and is more efficacious at the later hours (*i.e.*, hours 8 through 12) than ADVIL. Tr. 1.203–04, 1.211–12, 1.217–20 (DeArmond); Tr. 6.9 (Bloomfield). This conclusion is bolstered by the FDA's formal findings concerning the ALEVE NDA, set forth in the agency's SBA, wherein the FDA concluded that the performance of the naproxen sodium compound in LABs 982 and 983 "indicated a similar analgesic efficacy as ibuprofen 200 and 400 mg respectively, with a longer duration of action, supporting a BID–TID dosing regimen." Def.Ex. 1, at C0051. Moreover, the record indicates that AHP's expert Dr. Payne (whom AHP did not call at the hearing) stated at deposition that naproxen was longer lasting than ibuprofen, as did AHP's Dr. Barr when first asked at his deposition. Tr. 3.91–96 (Barr); Payne Dep. 82, 148, 174.

AHP does not presently dispute the manner or method by which the Syntex studies were conducted. Tr. 2.123 (Cooper). Instead, plaintiff argues that the studies' results with respect to favorable ALEVE trends should be discounted because in all three studies there was no statistically significant difference between the times for remediation for ibuprofen and naproxen sodium. Tr. 3.147 (Laird).[9] In addition, plaintiff takes issue with defendants' reliance on the trends displayed on the time-effect curves (*i.e.*, the PID and PAR measures).

With respect to the time for remediation, plaintiff places great importance on the fact that the differences in median time for remediation in the three studies were not statistically significant, even though in two of the three studies ALEVE even bested AD-

---

9. The primary variable for measuring duration of action as stated in each studies' protocol was the time to taking back-up medication. Def.Ex. 2, at A000068; Def.Ex. 3, at A000540; Def.Ex. 5, at B02080. The protocol for a clinical study defines the question(s) that the study is designed to answer and the statistical analysis that will produce that answer. Pl.Ex. 702 (FDA Guideline for the Format and Content of Clinical and Statistical Sections of New Drug Applications) at 121; Tr. 3.195 (Laird).

VIL on median remedication time. However, the record does indicate that the median time for remedication does not test the distribution of remedicating patients and is not necessarily an indication of how long a drug lasts. Tr. 1.213–216 (DeArmond) ("the distribution is best captured by the overall analysis"). In addition, the Court notes the testimony that AHP's expert Dr. Barr gave before Congress in which he stated that the fact that a clinical study does not reveal a statistically significant difference between two drugs does not *ipso facto* show the absence of a difference. Tr. 3.86–87 (Barr). *See also* Tr. 5.134 (Landis) (even if a study does not show statistically significance differences, "[y]ou want to also see how different the results are and what the trends look like and whether there is consistency across findings"). This observation is keenly relevant here given the trends favoring ALEVE with respect to the time to remedication scores.

Moreover, the Court also discounts AHP's criticism that the data garnered from the PID and PAR scores is incredible. AHP first avers that reliance on the hourly PIDs and PARs to show trends favoring ALEVE at the later hours is disfavored given that PIDs and PARs were not the primary variable for measuring duration. This contention, however, is surprising when one considers that AHP's clinical expert Dr. Cooper recently concluded in a study conducted for AHP that ibuprofen was longer lasting than acetaminophen based on the drugs' PID and PAR scores, despite the fact that ibuprofen and acetaminophen had no statistically significant differences in their respective time to remedication measures. Tr. 2.113–18 (Cooper). In addition, the Court finds that Dr. Bloomfield properly relied on the differences between ALEVE and ADVIL on the time-effect curves at the late hours of each study when he opined that a consistent trend on these curves favored ALEVE. Tr. 6.11–15 (Bloomfield).

Finally, plaintiff argues that these PID and PAR measures include large amounts of fictitious data. When patients remedicate and "drop out" of the study, Syntex, following the common industry practice, opted to "impute" a pain relief and intensity score for each patient after she or he remedicated. Tr. 3.151–53 (Laird). AHP alleges that Syntex chose the imputation method that carried forward pain intensity at the highest level recorded for each patient that remedicated. Tr. at 3.151 (Laird); Tr. at 5.127–28 (Landis). While AHP does not contend that imputation of data is improper or even unusual, it does aver that statistical measures which include large amounts of imputed data, specifically the hourly PID and PAR scores for the late hours of the study after most patients have dropped out, are inherently unreliable.

However, the parties are in agreement that it is important to impute data with respect to treatment failures (*e.g.*, study participants who remedicate prior to the end of the study). Tr. 3.179–80 (Laird). Biostatistics expert Dr. Landis stated on cross-examination that "[i]f you leave the patients out that remedicated, you have a very serious bias." Tr. 5.149 (Landis). Indeed, Dr. Cooper conceded that both AHP and Procter/Syntex employ this method of data imputation (Tr. 2.105–09 (Cooper)), and that this method was customarily used in the industry. Tr. 2.124 (Cooper). Thus, this testimony essentially confirms Dr. Landis's statement that defendants' method of accounting for these treatment failures is "precisely the same way" other tests have addressed the issue of patient remedication during a study. Finally, the Court credits Dr. Bloomfield's testimony that the amount of data imputed by Syntex in the three studies is within an acceptable range. Tr. 6.16–17 (Bloomfield). Accordingly, I find that the evidence does not conclusively support AHP's assertion that a claim of ALEVE's late-hour duration and efficacy superiority would be literally false.

### G. Dosing in Persons Age 65 and Over

AHP further seeks to enjoin defendants' claim that persons over the age of 65 can safely medicate using the dosing schedule permitted by law for persons under the age of 65.[10] AHP introduced testimony that to determine whether 220 mg. (1 tablet) of

---

10. The ALEVE packaging advises that *"Adults over age 65:* Do not take more than 1 caplet every 12 hours, unless directed to do so by a doctor."

ALEVE would be effective for 12 hours in a person 65 and over, one would have to perform appropriately designed studies of high sensitivity in that specific population. Tr. 3.60 (Barr). No such studies have been performed with respect to ALEVE. *Id.*

In addition, plaintiff also claims that if persons over 65 do not obtain effective pain relief for 12 hours utilizing one tablet of ALEVE, there are only two possibilities: either they have to endure pain until 12 hours expire, or they redose too soon and increase the accumulation of the free fraction of the drug (and the possibility of toxic effects) in their bodies. Tr. 3.67 (Barr). No data has been introduced that correlates the level of free fraction of naproxen sodium to efficacy. Tr. 4.161 (Benet).

However, as will be discussed *infra*, the Lanham Act plaintiff bears the burden of showing that a claim is misleading, not that it is merely unsubstantiated by acceptable tests. Thus, the fact that AHP's experts feel further studies on the duration of activity of ALEVE in the elderly need to be performed does not demonstrate that the claim is false or misleading. In addition, the Court notes that plaintiff did not set out any evidence in the form of a consumer survey that could support its present challenge; indeed, plaintiff's survey expert, Dr. Pace, admitted that his survey did not address whether a consumer could take away a message from the ALEVE advertising that an elderly person will receive a full 12 hours of relief from the drug. Tr. 4.106 (Pace).

The Court further notes the testimony of defendants' pharmacologist Dr. Benet, who stated that in elderly patients the drug is not eliminated from the body as rapidly as in younger patients, thereby allowing more of the naproxen sodium to remain in the body for a longer time period. Tr. 4.144 (Benet). Thus, the elderly do not need as many doses of the drug to achieve the same pain relief. Moreover, while plaintiff's expert Dr. Barr used data extracted from two arthritis studies to show that elderly patients remedicated before twelve hours, he did acknowledge that those studies were not designed to measure duration of activity and that "we weren't using that data to go back and make a statement on what duration of activity was." Tr. 3.109 (Barr). Indeed, Dr. Barr noted that he was "not aware of any specific information on the elderly with ALEVE at all." Tr. 3.125 (Barr). Accordingly, plaintiff has failed to prove that this challenged claim is false or misleading.

### H. The Prescription Heritage Claim

AHP contends that the following ALEVE claims are false and/or misleading: (1) "ALEVE is a non-prescription strength of ANAPROX, a fast-acting form of the medicine in NAPROSYN, the # 1 selling brand in its class for ten years," and (2) "ALEVE contains a fast acting, non-prescription strength of naproxen, the medicine in NAPROSYN."[11] This protestation must also fail. AHP admitted, through its memorandum to ABC and via the testimony of Andrew Davis, that neither the print nor the television introduction of ALEVE contained explicitly false claims. Def.Ex. 31; Tr. 1.87 (Davis). Moreover, a case of implied falsity cannot be made out here as there is no consumer survey establishing that the public has been misled by this claim. In addition, I find that even AHP's witnesses have essentially agreed that the first claim recapitulated above is not false. Tr. 1.97–103 (Davis); 1.195 (DeArmond). Finally, as to the second claim noted above, the Court notes that the statement had been pre-cleared by the FDA and has never been used in defendants' advertising. Tr. 5.76 (Zabrowski); 1.98 (Davis).

### I. The 32 Studies Claim

The ALEVE professional advertisements (*see, e.g.,* Pl.Ex. 214) state, under the heading, "THE ACTIVITY OF NAPROXEN SODIUM," that "The efficacy of ALEVE has been confirmed in 32 clinical trials involving 2,857 patients." AHP claims that on its face this communicates to the reader that 32 clinical studies have been performed using ALEVE, *i.e.,* naproxen sodium at the OTC

---

11. This statement was included in a January 1994 Procter/Syntex press release. Pl.Exs. 201, 202, 203.

dosage and in accordance with the OTC dosing schedule.

This message, according to plaintiff, is literally false. It appears from a review of the exhibit appended to a stipulation of the parties that there are 9 clinical studies involving 855 patients in which naproxen sodium proved to be more effective than placebo, using defendants' own criterion of effectiveness based on a statistically significant difference from placebo in a primary variable relating to efficacy. Stip. of 10/25/94, Ex. A. The remaining 25 studies relied upon by Procter/Syntex were conducted with naproxen. Tr. at 1.181–82 (DeArmond). In addition, it appears that at the time Procter/Syntex made its 32 studies claim, only five single-dose naproxen sodium clinical trials, involving only 445 subjects, had been conducted under the approved ALEVE OTC dosing schedule (clinical trial nos. LAB 982, LAB 983, LAB 984, CRD 92–12, and CRD 88–06). Stip. of 10/25/94, Ex. A.

The parties have entered into a stipulation with respect to the 32 studies claim, which reads in pertinent part as follows:

1. The chart attached as Exhibit A lists 34 clinical studies in which naproxen or naproxen sodium treatment groups separated significantly from placebo on at least one primary efficacy variable at or prior to the time they were given doses that did not exceed the dosing regimen provided for ALEVE. The parties agree that this chart, marked as Defendants' Exhibit 96, shall be admissible in evidence pursuant to Federal Rule [of] Evidence 1006.

2. The parties agree that, with respect to the claim in defendants' professional promotional materials that "the efficacy of ALEVE has been confirmed in 32 clinical trials involving 2,857 patients," the only issue to be decided by the Court in connection with plaintiff's motion for preliminary injunction is whether studies and patients meeting the criterion described in paragraph 1 above "confirm the efficacy of ALEVE." If the Court decides that this is the appropriate criterion, the defendants hereby agree to modify the present claim to reflect the number of studies and patients listed in Defendants' Exhibit 96. It

is understood that there may in the future be additional clinical trials which meet this criterion and, if such trials are completed, defendants reserve the right to modify the claim accordingly.

Stip. of 10/25/94.

After reviewing this matter, the Court concludes that the criterion employed by Procter/Syntex in determining whether a study was to be included in the 32 studies (i.e., if a treatment group given naproxen or naproxen sodium at OTC doses or lower separated from placebo on at least one primary measure of efficacy) was appropriate. Accordingly, the challenged statement is not false. The Court notes that since it has determined that defendants' selection criterion was proper, the defendants are to adjust their claim pursuant to the aforementioned stipulation to reflect the precise number of clinical tests and patients meeting this criterion.

## II. Conclusions of Law

▮ The standards for issuance of a preliminary injunction in Lanham Act cases, as in all others, are well-settled. In ruling on a motion for preliminary injunction, the court must consider: (1) the likelihood that the plaintiff will prevail on the merits; (2) the extent to which the plaintiff is being irreparably harmed; and, where relevant, (3) the extent to which the defendant or other interested persons will suffer irreparable harm if the injunction is issued; and (4) the extent to which the public interest favors the granting of the requested relief. See *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods.*, 963 F.2d 628, 632–33 (3d Cir.1992); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197–98 (3d Cir.1990) (citations omitted). See also *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987). "[T]he grant of injunctive relief is an extraordinary remedy ... which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988), citing *United States v. City of Philadelphia*, 644 F.2d 187, 191 n. 1 (3d Cir.1980). See also *Falter v. Veterans Administration*, 632 F.Supp. 196, 201 (D.N.J.1986) (quotations omitted) ("There is no power the exercise of which is more delicate, which requires greater caution, deliber-

ation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction"). An injunction should issue only if the plaintiff produces evidence sufficient to convince the court that all four factors favor preliminary relief. *Opticians Ass'n v. Independent Opticians,* 920 F.2d 187, 192 (3d Cir.1990). Because the Court finds that plaintiff has not successfully carried its burden of showing a reasonable probability of eventual success on the merits, the Court will deny the instant application for preliminary relief.

### A. Reasonable Likelihood of Eventual Success

#### 1. The Relevant Statute and Governing Standards

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a civil remedy for the use of any false or misleading description of fact, or false or misleading representation of fact, in connection with the sale of goods in interstate commerce. It states in relevant part:

(1) Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—

    \*    \*    \*    \*    \*    \*

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, or services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

■ To prevail on a claim of false advertising under the Lanham Act, a plaintiff must demonstrate by a preponderance of the evidence that defendants' claims are either literally false or are misleading to the consuming public. *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990). A claim that is unsupported which is not literally false or deceptive does *not* violate the Lanham Act. *Toro Co. v. Textron, Inc.,* 499 F.Supp. 241, 253 (D.Del.1980).

Moreover, the absence of acceptable tests or other proof substantiating an advertising claim does not alleviate a Lanham Act plaintiff's burden of showing that a challenged advertisement is false or misleading. *Sandoz,* 902 F.2d at 228. Thus, a plaintiff must affirmatively prove that the claim in question "is false or misleading, not merely that it is unsubstantiated." *Johnson & Johnson–Merck v. Rhone–Poulenc Rorer,* 19 F.3d 125, 129 (3d Cir.1994), citing *Sandoz,* 902 F.2d at 228.

■ If a plaintiff persuades the court that the challenged advertisement is literally or explicitly conveying a false message (*i.e.,* that the ad is false on its face), relief may be granted without resort to any extrinsic evidence of consumer reaction. *Rhone–Poulenc,* 19 F.3d at 129. In assessing whether an advertisement is "literally false" a court must consider the message in full context. An advertisement may be literally or "facially false" based on the message it conveys by "necessary implication," despite the fact that the false statement was not made "in haec verba." *Castrol Inc. v. Pennzoil Co.,* 799 F.Supp. 424, 437 (D.N.J.), *aff'd,* 987 F.2d 939 (3d Cir.1993).

■ However, where advertisements are not claimed to be or cannot be shown to be literally false, the plaintiff bears the burden of proving that consumers are actually misled by implied advertising claims by a preponderance of the evidence. *Sandoz,* 902 F.2d at 228–29. The plaintiff " 'must persuade the court that the persons 'to whom the advertisement is addressed' would find that the message received left a false impression about the product.' " *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 922 (3d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990) (citation and quotation omitted). The success of the implied claim usually turns of the persuasiveness of a consumer survey. *Rhone–Poulenc,* 19 F.3d at 129–30. As the Third Circuit stated in *Sandoz,* the Lanham act plaintiff "cannot obtain relief by arguing how consumers *could* react; it must show how consumers *actually do* react." *Sandoz,* 902 F.2d at 229. The Court will address

plaintiff's claims of literal and implicit falsity *seriatim.*

### 2. Literal or Explicit Falsity

■ "If advertisements are false on their face, a court may find a 'tendency to deceive' without looking to evidence of actual consumer response." *Stiffel Co. v. Westwood Lighting Group,* 658 F.Supp. 1103, 1111 (D.N.J. 1987). After a careful review of the evidence, the Court concludes that AHP has not successfully established a claim of literal falsehood in the instant action.

■ The burden of proof which plaintiff must satisfy in a false advertising action has been well articulated by the Third Circuit in *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990), in which that court affirmed the district court's denial of a preliminary injunction in a Lanham Act dispute between two rival cough syrup manufacturers. In *Sandoz,* the plaintiff sought to prevail by showing simply that the defendant's advertising claims about its OTC drug's effectiveness were inadequately substantiated, without also showing that the claims were literally false or misleading to the public. *Sandoz,* 902 F.2d at 227. In rejecting plaintiff's contentions, the Third Circuit stated that a Lanham Act plaintiff "'bears the burden of showing that a challenged advertisement is false or misleading, *not merely that it is unsubstantiated by acceptable tests or other proof.'*" *Sandoz,* 902 F.2d at 228, quoting *Procter & Gamble Co. v. Cheesebrough–Pond's, Inc.,* 747 F.2d 114, 119 (2d Cir.1984) (emphasis supplied). Thus, under *Sandoz,* a plaintiff relying on clinical data to demonstrate the literal falsity of a claim must affirmatively establish that that evidence demonstrates the patent falsity

of the challenged claim, as opposed to simply failing to lend overwhelming credence to it.

When applied to the instant action, *Sandoz* clearly precludes a finding that AHP has met its burden of proof. A review of the testimony of Dr. Cooper reveals that he did not avow that the clinical evidence proved that ALEVE and ADVIL had the same duration. Dr. Cooper merely stated he did not see any differences between ALEVE and ADVIL (Tr. 2.76 Cooper), but did not confirm that the tests *proved* that no differences existed. Indeed, Dr. Cooper testified that toward the end of the studies, "the preponderance of the data is kind of balanced whether differences exist or not." Tr. 2.77 (Cooper). Balance, however, is far from conclusive establishment. Moreover, in response to my own inquiry this witness acknowledged that "a trend appeared to be happening" favoring ALEVE with respect to the later hours of the studies. Tr. 2.146–47 (Cooper).[12] Thus, while it cannot be gainsaid that defendants have not proven their product lasts longer than plaintiff's, defendants do not have the burden of proof in this case. The plaintiff does. However, it is incontrovertible that plaintiff's evidence, in the form of their experts' testimony, is simply insufficient to sustain its burden of proof under *Sandoz* with regard to establishing literal falsity here.[13]

In seeking to prove literal falsity by showing that there were no statistically significant differences between ALEVE and ADVIL with respect to the studies' primary variables (Tr. 6.196–97), plaintiff relies upon and urges this Court to follow the Second Circuit's decision in *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544 (2d Cir.1991). In *McNeil,* defendant Bristol–Myers advertised that its product, ASPIRIN FREE EXCED-

---

**12.** In addition, the Court notes that Dr. Barr's opinion at the hearing that the studies showed no statistical difference between ALEVE and ADVIL was in contravention of his earlier deposition testimony in which he agreed that he could not opine that there was no difference between the two drugs in the duration of analgesia. Tr. 3.80–85 (Barr).

**13.** In addition, the Court notes that plaintiff's assertion of literal falsity claims in the print advertising is untenable since it has admitted elsewhere that the ALEVE advertising contains

no explicit claim of greater duration or efficacy to ADVIL. A review of Def.Ex. 31 recalls AHP's statement that "[w]hatever the recent P & G/Syntex Aleve newspaper ads and TV commercials might *imply,* they have been careful to avoid any *explicit* claim of greater duration or efficacy than Advil." Moreover, the Court also points to the testimony of AHP's Andrew Davis, wherein he concedes that ALEVE's advertisements make only a parity claim against ADVIL and that none of the challenged claims are literally false. Tr. 1.87, 91–93 (Davis).

RIN, "works better" than plaintiff's EX-TRA-STRENGTH TYLENOL, a claim that was bottomed on the results of its own clinical studies. *McNeil,* 938 F.2d at 1549. The district court determined that a claim to superior efficacy could be proved or disproved only in clinical studies comparing the drugs at issue in comparable dosages. When properly analyzed, the court found relevant clinical tests showed no statistically significant differences between the drugs. In affirming the holding that the Bristol–Myers' ad was false and enjoining the EXCEDRIN advertising, the Second Circuit stated:

> In the present case, McNeil has sustained its burden of proving Bristol–Myers' superiority claim to be false. Despite Bristol–Myers' arguments to the contrary, McNeil did more than merely critique and expose the methodological weaknesses of the AF EXCEDRIN studies. McNeil affirmatively demonstrated to the satisfaction of the district court that a proper analysis of the period one data—which the court found to be the only relevant and reliable scientific data—*conclusively established* that AF EXCEDRIN did not relieve pain better than ES TYLENOL to a statistically significant degree. Such proof was sufficient to establish that Bristol–Myers' superiority claim was false.

938 F.2d at 1549–50 (emphasis supplied). Thus, AHP essentially contends that to carry its burden with respect to proving the literal falsity of defendants' advertisements, it must only show that the probative clinical evidence fails to definitively or "conclusively" reveal statistically significant differences between the two OTC analgesics.

At the outset this Court notes that its decision is guided by Third Circuit precedent as set down in *Sandoz.* However, even if I were inclined to heed AHP's suggestion and follow *McNeil,* that case still does not carry the day for plaintiff, as an examination of the decision indicates that the Second Circuit predicated the holding on its finding that a reliable reinterpretation of the clinical data demonstrated *conclusively* that no significant differences existed between the products. But in this action, unlike *McNeil,* it cannot be said that the defendants' studies proved,

let alone "conclusively established," that the two analgesics are the same. While the Syntex studies do not show that ALEVE has a duration of action superior to ADVIL, they do reveal certain trends favoring naproxen sodium over ibuprofen, especially with regard to PID and PAR scores, at the late hours of the study. In addition, with respect to the time to remediation scores, while there are no statistically significant differences between the drugs, in two of the three studies ALEVE performed better than ADVIL on that measure. Indeed, as noted previously, the absence of a statistically significant result on the time to remediation score does not conclusively establish that the drugs are the same, since even AHP's clinical expert Dr. Cooper based a durational conclusion as to ibuprofen and acetaminophen in a prior study based on the differences in the drugs' PID and PAR scores—the same approach propounded here by Procter/Syntex. Thus, although the reliable data in this case do not prove with statistical certainty that ALEVE is longer lasting or better than ADVIL, the consistent trends favoring the former analgesic over the latter at the very least preclude any assertion by plaintiff that it has conclusively established the falsity of defendants' claim. Accordingly, the Court cannot say, based on the evidence before it, that the claim challenged here is literally false.

### 3. Implied Falsity

Because "[p]ublic reaction is the measure of a commercial's impact," an implied falsity claim must be proven in a false advertising case via the use of a consumer survey. *Rhone–Poulenc,* 19 F.3d at 129–30. " 'The probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate.' " *Id.* at 134, citing *Weight Watchers Int'l, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1272 (S.D.N.Y.1990). Surveys must have certain hallmarks of reliability. *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978). In rejecting a survey prepared for litigation use, the Third Circuit reviewed several factors which must be examined when determining the intrinsic reliability of a survey. *Pittsburgh*

*Press Club,* 579 F.2d at 758. The court noted that:

> A proper universe must be examined and a *representative* sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation.

*Id.* For the reasons discussed below, AHP's surveys do not provide a reliable basis for determining whether any implied messages are being communicated by the ALEVE promotional campaign.

**(a). Unreliability of the FSI Survey**

■ The Court discounts the reliability of the FSI survey due to its use of two techniques that it deems coercive. First, the Court objects to AHP's repetition of four open-ended questions followed by a fifth query which specifically invited the participants to make a direct comparison between ALEVE and ADVIL. While this final question is troublesome given its suggestive nature alone, it becomes unacceptable given my finding that this question was used as a device to prompt the survey participants to continue to search for messages that they initially did not perceive to be conveyed by the FSI. This holding thus echoes the position taken by the Third Circuit in *Johnson & Johnson–Merck v. Rhone–Poulenc Rorer,* in which it affirmed the district court's rejection of a survey based on, *inter alia,* the fact that many of the responses were elicited only after repeated probes. *Rhone–Poulenc Rorer,* 19 F.3d at 133. In addition, the Court notes the opinion of the district court in *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,* 1991 WL 206312 (S.D.N.Y. Oct. 1, 1991), *aff'd,* 960 F.2d 294 (2d Cir.1992), in which the court discounted as too leading a

survey's use of several open-ended questions concerning an antacid commercial followed by two virtually identical questions asking participants to compare the products at issue because the comparison question was repeated two times. *Smithkline,* 1991 WL 206312, *8.

■ The second improper technique of the FSI survey was the extended time the participant was permitted to study the insert. As noted *supra,* each survey respondent had the opportunity to view and review the FSI during the course of the entire survey interview, which typically lasted from 10 to 15 minutes. This failure to simulate with any remote realism how consumers actually react to coupon inserts undercuts the reliability of the FSI survey, as the survey becomes more like an open-book test than a measure of realistic consumer reaction. *See, e.g., Berkshire Fashions, Inc. v. Sara Lee Corp.,* 725 F.Supp. 790, 797–98 (S.D.N.Y.), *aff'd,* 904 F.2d 33 (2d Cir.1990) (rejecting survey because side-by-side display of competing products did not replicate consumer behavior in the marketplace). Finally, the Court recognizes that since defendants will no longer publish the FSI in its present form, injunctive relief with respect to that insert is simply not required (even if the facts merited it), as precedent exists to support the conclusion that the need for injunctive relief is obviated where a defendant represents that an advertisement's transmission to the public will not be repeated. *See, e.g., Consumers Union of United States, Inc. v. General Signal Corp.,* 724 F.2d 1044, 1052 n. 11 (2d Cir.), *cert. denied,* 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *American Express Travel Related Serv. v. Mastercard,* 776 F.Supp. 787, 791 (S.D.N.Y.1991); *Tambrands, Inc. v. Warner–Lambert Co.,* 673 F.Supp. 1190, 1198 (S.D.N.Y.1987).[14]

**(b). Unreliability of the Television Survey**

■ It is clear that in a false advertising action survey results must be filtered via an

14. Plaintiff has made an allegation that defendants have claimed, ostensibly via the bar graph, that EXTRA–STRENGTH TYLENOL has a longer duration than ADVIL. However, as the FSI has produced no dependable data with respect to whether consumers received and/or were misled with respect to EXTRA–STRENGTH TYLENOL, the Court must discount this claim as well.

adequate control mechanism to screen out those participants who took away no message from the advertisement as well as to account for those consumers who may have brought to the survey certain publicly held preconceptions regarding the product. *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 301 (2d Cir.1992); *Rhone–Poulenc Rorer*, 19 F.3d at 134; *American Home Products Corp. v. Johnson & Johnson*, 654 F.Supp. 568, 590 (S.D.N.Y.1987). In fact, the Second Circuit has held, in *Johnson & Johnson–Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, that where a portion of the survey population may have held extrinsic beliefs prior to viewing an advertisement, a control mechanism would likely be "indispensable." *Smithkline Beecham Corp.*, 960 F.2d at 301.

■ In this case AHP's expert has conceded that the survey's built-in control mechanism could not in fact. control for any preconceptions regarding analgesics that the survey population may have possessed, even though some type of "noise" filter was clearly demanded. The existence of OTC analgesic noise was confirmed by the fact that when the same survey was conducted substituting an ADVIL commercial for the ALEVE spot, virtually the same results were obtained. Absent a valid noise filter, the Court is unable to discern if AHP's survey results are attributable to the advertisement or are instead attributable to consumers being bombarded with years of OTC advertising from which their pre- or misconceptions of these products have developed. Accordingly, the Court must discount plaintiff's television commercial survey.[15]

### (c). Inapplicability of AHP's Surveys to other ALEVE Advertising

■ The Court rejects AHP's contention that the FSI and television survey, even if probative, can be employed to assess whether other ALEVE print advertising (*i.e.*, the

*New York Times* advertisement) was false or misleading to the public. *See American Express Travel Related Serv. v. Mastercard*, 776 F.Supp. 787, 789–90 (S.D.N.Y.1991) (holding that consumer survey performed on one television commercial had no bearing on a slightly revised version of the original ad). In addition, the Court is not persuaded that the testimony of AHP's witnesses as to whether untested ALEVE advertisements were misleading overcomes its failure to present reliable survey proof. The Third Circuit has made it patently clear that an expert's "personal opinion [as to what messages consumers received from an advertisement] is not the legal standard by which the courts must determine whether consumers were misled." *Rhone–Poulenc Rorer*, 19 F.3d at 136, citing *Sandoz*, 902 F.2d at 228–29. Absent "well-designed consumer surveys. . . . neither the district court nor this court can conclude that consumers were misled." *Id.*

■ Finally, the Court states that AHP cannot circumvent the survey requirement by pointing to an alleged intent on defendants' part to communicate a superior duration claim for ALEVE over ADVIL. While the Court did not make any explicit finding previously in this Opinion that defendants' overall marketing strategy demonstrated an intent to impart a superior duration message, it did note that such a finding is insufficient to merit an injunction since the proof did not establish that defendants' actions were in any way egregious. In the Third Circuit's recent *Rhone–Poulenc Rorer* decision, plaintiff Johnson–Merck maintained that Rorer's claim that its antacid product was "the strongest antacid there is" was false and/or misleading. Johnson–Merck contended it adduced evidence which showed Rorer clearly intended to convey a message of superior antacid relief by making its "strongest antacid" claim. *Rhone–Poulenc Rorer*, 19 F.3d at 130. After reviewing the extensive and rath-

---

15. The Court recognizes that AHP has challenged the statement in an ALEVE television commercial "When you've tried the ADVIL . . ." as communicating that "ALEVE works when ADVIL does not." This claim is clearly an implied claim (*see* Def.Ex. 31; Tr. 1.87 (Davis)), and hence its establishment hinges on a reliable consumer survey. However, since the foregoing discussion has demonstrated that the data accumulated in the television survey must be discounted, this claim cannot pass muster.

er probative evidence in question, the court held that the intended "halo effect" of Rorer's advertising was to impart a superior relief message. *Id.* at 131 ("[w]e cannot see how the change of stated consumer promise in copy strategy documents and the addition of a claim of fast relief altered the halo effect of superior relief that attached to the phrase 'strongest antacid there is' ...").

However, the court opined further that even if evidence of an intent to mislead had been presented, the plaintiff nevertheless was still obliged to show that the defendant engaged in "deliberate," "clear," and "egregious conduct" before it may avail itself of a presumption that misleading messages are being conveyed in an advertisement. *Id.* at 131–32. *See also Smithkline Beecham Corp.,* 960 F.2d at 298–99; *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation, Inc.,* 926 F.2d 134, 140 (2d Cir.1991). Despite the great weight of the evidence demonstrating an intent to mislead, the court found that the actions of the defendant were simply not egregious. Since I have found that defendants did not engage in deliberately egregious conduct, my conclusion in this case mirrors the Court of Appeals's holding in *Rhone–Poulenc Rorer* that "even if we agree that [plaintiff] has presented evidence of [defendants'] intent to mislead, this alone is insufficient to [establish that intent]." *Id.* at 131.

### (d). The Over 65 Dosing and Prescription Heritage Claims

■ The only claims remaining for review by this Court are AHP's contentions that defendants falsely claimed that persons over age 65 can safely medicate using the dosing regimen permitted for younger individuals and its challenge to ALEVE's claimed prescription heritage in the ads directed to medical professionals. However, as the Court has previously stated, AHP has not come forward with the requisite consumer surveys, so that no claim of implicit falsity can be made out. Indeed, with respect to

the professional ads, the Third Circuit has confirmed that a survey is required to see if the intended audience, even with its special knowledge of the product, was actually misled. *Sandoz,* 902 F.2d at 229–30. There is no such survey here. Additionally, a claim of literal falsity with respect to these claims also cannot stand since, as noted previously, there is clinical evidence in the record to support them.

### III. Conclusion

■ As the foregoing illustrates, plaintiff cannot establish that it has a reasonable probability of success with its Lanham Act claims, as it cannot demonstrate that the advertisements at issue are either explicitly or implicitly false. Since plaintiff cannot establish the existence of this initial prong of the preliminary injunction inquiry, it is ineligible for such relief.[16] Accordingly, for the reasons stated herein, plaintiff's motion for a preliminary injunction is **DENIED.** In addition, with respect to plaintiff's 32 studies claim, the defendants are obligated, pursuant to the language contained in the parties' stipulation, to adjust this advertising claim to reflect the precise number of clinical tests and patients meeting the criterion which was outlined in the stipulation and adopted by this Court in its Opinion. An appropriate Order will issue with this Opinion.

Finally, the Court notes that before deciding the instant motion, it heard days of testimony and reviewed countless exhibits, including free-standing inserts, gravity-fed dispensers, clinical data and television commercials. It is thus not surprising that the Court presently finds itself in possession of a monumental headache, the alleviation of which is beyond the durational powers of any of the analgesics discussed herein. Accordingly, in an effort to achieve long lasting and efficacious relief, the Court will take them all.

### *ORDER*

This matter having come before the Court on the application of plaintiff for a prelimi-

---

**16.** As the Court has found that there is no reasonable likelihood of success on the merits, there is no need for the Court to discuss the other aspects of the injunction inquiry. *See Opticians Ass'n v. Independent Opticians,* 920 F.2d 187, 192 (3d Cir.1990). In addition, the Court notes that since plaintiff cannot demonstrate that the

ALEVE advertisements are false and/or misleading, it does not qualify for the presumption of the existence of irreparable injury that would otherwise result in cases such as this where the advertisements make a comparison between competing products. *Mastercard,* 776 F.Supp. at 791, citing *McNeil,* 938 F.2d at 1549.

nary injunction, and the Court having conducted a hearing thereon, and having considered the matter and the submissions of the parties in support of and in opposition to the instant application, and for the reasons appearing more particularly in the Opinion of this Court in the above-captioned matter dated December 27, 1994, and good cause having been shown,

**IT IS** on this 27th day of December, 1994 hereby

**ORDERED** that plaintiff's application for a preliminary injunction be and the same hereby is **DENIED,** and it is further

**ORDERED** that defendants shall adjust their advertising claim that "The efficacy of ALEVE has been confirmed in 32 clinical trials involving 2,857 patients" to reflect the precise number of clinical tests and patients meeting the criterion outlined in the stipulation of the parties and adopted by this Court in its Opinion.