**PHARMACIA CORPORATION, et al., Plaintiffs,**

v.

**GLAXOSMITHKLINE CONSUMER HEALTHCARE, L.P., et al., Defendants.**

**No. CIV.A. 02–5292(MLC).**

United States District Court, D. New Jersey.

Nov. 24, 2003.

John C. McGuire, Sedgewick, Detert, Moran & Arnold, LLP, Newark, N.J. and John B. Williams, Judith L. Oldham, Kerrie L. Hook, and Thomas W. Mitchell, Collier Shannon Scott PLLC, Washington, D.C., for Plaintiff.

William F. Maderer, Saiber Schlesinger Satz & Goldstein LLC, Newark, N.J., and Helene D. Jaffe, Bruce S. Meyer, and Randi W. Singer, Weil, Gotshal & Manges LLP, New York, N.Y., for Defendant.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on the motion by plaintiff Pharmacia Corporation ("Pharmacia") pursuant to Federal Rule of Civil Procedure ("Rule") 65(a) for a preliminary injunction enjoining defendant GlaxoSmithKline Consumer Healthcare, L.P. ("GSKCH") from broadcasting two television commercials. Pharmacia

contends that certain of the claims made by GSKCH's commercials violate Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a) ("the Lanham Act"). The Court will grant in part and deny in part Pharmacia's motion.

## BACKGROUND

This case involves a dispute between distributors of over-the-counter ("OTC") products designed to help purchasers stop smoking cigarettes. Pharmacia and GSKCH market competing brands of nicotine replacement therapy ("NRT") products in the United States. (Pharm. Proposed Findings of Fact and Conclusions of Law ("PFFCL") at 6.) Pharmacia sells a nicotine transdermal patch under the brand name Nicotrol ("Nicotrol"). (GSKCH PFFCL at 1.) GSKCH markets a competing nicotine transdermal patch under the brand name NicoDerm CQ ("NicoDerm"). (Id.) GSKCH also sells a nicotine gum under the brand name Nicorette ("Nicorette"). (Id.)

GSKCH began airing two commercials on December 22, 2002, which the parties refer to as "Revised Tough Decision" and "Revised Smart Choice." (Pharm. PFFCL at 12.) "Revised Tough Decision" features an actor portraying a consumer deciding whether to buy Nicorette or Nicotrol. (GSKCH PFFCL at 9.) A voice-over asks: "Trying to quit smoking? According to the labels, Nicorette gum can be used whenever you need it, day or night. Nicotrol's patch can only be worn for 16 hours." (Id.; Pharm. PFFCL at 12.) Superimposed text at the bottom of the screen reads: "Used anytime. Use as directed." (GSKCH PFFCL at 9.) The announcer then states: "So much for flexibility," after which the actor chooses Nicorette. (Id.)

"Revised Smart Choice" is a commercial contrasting NicoDerm and Nicotrol. An announcer compares the two products on four criteria, as an animated checklist appears on the screen depicting the features being described. (Id. at 15.) The announcer states that: (1) both products feature a three-step program; (2) NicoDerm alone offers a program for lighter smokers; (3) users can wear NicoDerm for "the day or 24 hours," while Nicotrol may only be worn for 16 hours; and (4) "more doctors prefer the patch that gives you the choice." (Id. at 15–16.) The commercial concludes with the announcer telling viewers: "NicoDerm CQ. The power of choice." (Id. at 16.)

Pharmacia asks the Court to enjoin GSKCH from showing "Revised Tough Decision" because the "claim that 'according to the labels,' the Nicorette gum may be 'used whenever you need it, day or night' is expressly false." (Pharm. PFFCL at 13.) Pharmacia also requests that GSKCH be enjoined from airing "Revised Smart Choice" because "(i) it implie[s] the false message that the use of NicoDerm CQ result[s] in superior quitting efficacy as compared Nicotrol, and (ii) the express claim that 'doctors prefer' NicoDerm CQ because it gives the user a 16 or 24 hour 'choice' [is] not established by GlaxoSmithKline's data." (Id.) The Court held an evidentiary hearing on February 3 & 4, 2003, April 23, 2003 and June 4, 2003, to determine whether an injunction should issue.

## DISCUSSION

"[A]n injunction is an extraordinary remedy, which should be granted only in limited circumstances." Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir.2002) (quotations omitted). The Court will only issue a preliminary injunction if we are

convinced that the following factors favor granting preliminary relief: (1) the

likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

*Id.* *See also AT & T v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994) ("The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief.").

## I. *Likelihood of Success on the Merits*

### a. *The Lanham Act*

Pharmacia must first show that at trial it is likely to succeed in proving that GSKCH's ads violate the Lanham Act. The Lanham Act reads, in pertinent part,

(1) Any person who ... in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or ... false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). To prove a Lanham Act violation, the complaining party must show:

(1) the defendant made false or misleading statements about the plaintiff's [or his own] product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff.

*Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 171 (3d Cir.2001). Here, neither party contests the existence of the latter three elements: materiality, travel in interstate commerce, or likelihood of injury. Accordingly, we will focus our inquiry on the first two showings: the false or misleading claim that deceives or has a tendency to deceive consumers.

A Lanham Act false or misleading statement may be proved in one of two ways. The plaintiff must show that "the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Novartis,* 290 F.3d at 586. If the plaintiff can show literal falsity, "the court may grant relief without reference to the advertisement's impact on the buying public." *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 943 (3d Cir.1993).

In analyzing whether an advertisement or product name is literally false, a court must determine, first, the unambiguous claims made by the advertisement ..., and second, whether those claims are false. A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.

*Novartis*, 290 F.3d at 586–87 (quotations and citations omitted). However, "only an *unambiguous* message can be literally false"; if the message is susceptible of more than one meaning, the plaintiff cannot assert literal falsity. *See id.* at 587.

Where the plaintiff is unable to demonstrate that the complained-of statement is literally false, a Lanham Act violation may still be established by proving that the commercial makes a false or misleading claim *and* that a substantial portion of consumers actually understand the ad to be making that claim. *See Johnson & Johnson–Merck Consumer Pharms. Co. v. Rhone–Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir.1994) ("*Rorer*"); *Dentsply Int'l, Inc. v. Great White, Inc.*, 132 F.Supp.2d 310, 324 (M.D.Pa.2000). When the plaintiff chooses this evidentiary route because literal falsity cannot be shown, the plaintiff "must prove that [the statement] is deceptive or misleading, which depends on the message that is conveyed to consumers." *Rorer*, 19 F.3d at 129. The plaintiff must therefore produce evidence that consumers are actually misled by the defendant's statements; speculation as to how consumers could react is insufficient. *See Highmark*, 276 F.3d at 171. "[T]he success of [the plaintiff's] claim usually turns on the persuasiveness of a consumer survey." *Rorer*, 19 F.3d at 129–30.

#### b. *"According to the Labels, Nicorette Gum Can Be Used Whenever You Need It, Day or Night"*

Pharmacia contends that GSKCH's statement in "Revised Tough Decision" that "According to the labels, Nicorette gum can be used whenever you need it, day or night" violates the Lanham Act because it is literally false. While the ad tells viewers that the label states Nicorette may be used any time the consumer needs it, Pharmacia argues, the label in actuality places limitations on when Nicorette may

be used. Specifically, the Court finds that the label instructs consumers to refrain from chewing Nicorette while eating or drinking, or within 15 minutes after eating or drinking. (3d Brideau Dec., Ex. B.) We find the label cautions users not to continuously chew one piece after another, and not to use more than 24 pieces per day. (*Id.*) Pharmacia asserts that these various restrictions render "Revised Tough Decision" literally false because there are significant periods of each day during which a user may not chew Nicorette.

The Court must determine "first, the unambiguous claims made by the advertisement . . ., and second, whether those claims are false." *Novartis*, 290 F.3d at 586. An unambiguous claim can be explicit, or can be necessarily implied by the advertisement. *Id.* at 586–87. If the statement in question does not make an unambiguous claim, there is no Lanham Act violation absent a showing of actual consumer deception. *See id.* at 587. The Court must look at the commercial as a whole when making its assessment. *See, e.g., Rorer*, 19 F.3d at 129 ("A determination of literal falsity rests on an analysis of the message in context.").

The Court finds that GSKCH's statement makes an ambiguous claim. In "Revised Tough Decision," the assertion "According to the labels, Nicorette gum can be used whenever you need it, day or night," is followed by the contrasting statement that Nicotrol may only be used for 16 hours. (GSKCH PFFCL at 12.) The announcer next whimsically quips: "So much for flexibility." (*Id.*) The commercial then states that Nicorette is to be used as directed. (*Id.*) We find that "Revised Tough Decision" as a whole conveys the message that Nicorette is a more flexible aid to quitting smoking than Nicotrol. Within this context, we further find that the statement "According to the labels, Nicorette

gum can be used whenever you need it, day or night" makes an ambiguous claim. One viewer could understand the commercial to claim that Nicorette's label allows consumers to use Nicorette at times when they would be unable to use Nicotrol.[1] Alternatively, another viewer might conclude that GSKCH is claiming that the label permits users to chew the gum whenever they feel like it, even during a meal. The statement is open to interpretation.

We thus cannot agree with Pharmacia that the words "According to the labels, Nicorette gum can be used whenever you need it, day or night" unambiguously claim that the label puts no restrictions whatsoever on the use of Nicorette. In essence, Pharmacia asks the Court to find that because Nicorette's label does not use the exact words used in "Revised Tough Decision," and further because the label puts some restrictions on the use of Nicorette, the phrase "According to the labels, Nicorette gum can be used whenever you need it, day or night" must necessarily be literally false. However, we find that while GSKCH's statement *could* be interpreted to mean "The label supports the proposition that there are no restrictions on Nicorette's use," the statement certainly does not unambiguously purport to reproduce the label verbatim. Nor does it unambiguously assert that the Nicorette label states that users may freely chew as many pieces of Nicorette gum as they please all day, all the time. Ultimately, the most that Pharmacia can show is that GSKCH's statement is open to interpretation. The Third Circuit, however, has observed that "[t]he greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion ... the less likely it is that a finding of literal falsity will be supported." *Novartis,* 290 F.3d at 587 (quotations omitted). The Court holds that Pharmacia has not established a likelihood of success on the merits for the claim that the statement "According to the labels, Nicorette gum can be used whenever you need it, day or night" is a literally false statement under the Lanham Act.[2] We will not preliminarily enjoin GSKCH from showing "Revised Tough Decision."

### c. Implied Superior Quitting Efficacy

Pharmacia claims that "Revised Smart Choice" violates the Lanham Act. Specifically, Pharmacia alleges that "Revised Smart Choice" makes the implied claim that NicoDerm is more effective at helping smokers quit smoking than other patches, such as Nicotrol. Such a claim, Pharmacia contends, is false, and is thus actionable under 15 U.S.C. § 1125(a).

Pharmacia does not assert that "Revised Smart Choice" makes an explicit, literally false claim of superior quitting efficacy. Therefore, on this motion for a preliminary injunction Pharmacia must demonstrate that at trial it could likely prove two things: (1) that a substantial portion of consumers believes that "Revised Smart Choice" claims NicoDerm's superior quitting efficacy; and (2) that this claim is false. *See Rorer,* 19 F.3d at 130 (stating that the issue is "whether the public was, in fact, misled"); *Castrol,* 987 F.2d at 943.

---

1. For example, if a consumer awoke in the middle of the night with a cigarette craving, Nicorette's label would permit him to chew a piece of Nicorette gum, while Nicotrol would be off-limits. (2–3–03 H'g Tr. at 273.)

2. Since we find that the statement in question makes an ambiguous claim, and since Pharmacia has not adduced any evidence of actual consumer confusion regarding this ad, we need not proceed to the second step to determine whether Pharmacia has shown a likelihood that it can show that GSKCH's claim is false. *See Novartis,* 290 F.3d at 587.

To prove the first element, consumer perception, plaintiffs generally rely upon consumer surveys. *See, e.g., Novartis,* 290 F.3d at 590; *Rorer,* 19 F.3d at 129–30. But courts are not bound to credit plaintiffs' survey evidence: "The probative value of a consumer survey is a highly fact-specific determination and a court may place such weight on survey evidence as it deems appropriate." *Id.* at 134 (quotations omitted). Survey evidence is only probative to the extent it contains certain hallmarks of reliability. *P'burgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978). Surveys are not credible where they rely on vague or leading questions, *Rorer,* 19 F.3d at 134, or fail to properly control for the effect of "noise" such as preconceptions or bias. *Am. Home Prods. Corp. v. Procter & Gamble Co.,* 871 F.Supp. 739, 761–62 (D.N.J.1994) ("It is clear that in a false advertising action survey results must be filtered via an adequate control mechanism...."). Controls are an essential feature of reliable survey evidence because they enable the surveyor to separate the wheat (the effect of the advertisement, alone, on the participant) from the chaff (the effect of "the participant's prior knowledge and/or prior (mis)conceptions"). *See id.* at 749.

We must address an important distinction before turning to Pharmacia's evidence of consumer reaction. This distinction is between the terms "superior efficacy" and "superior quitting efficacy," which Pharmacia uses interchangeably. (*See, e.g.,* 2–3–03 H'g Tr. at 82–83.) If product A has "superior efficacy" in relation to product B, this means only that product A works better than product B in some way. In the context of nicotine patches, as GSKCH's experts Dr. Yoram Wind and Dr. Jack Henningfield testified, the Court finds that consumers could believe one patch to have "superior efficacy" in relation to another because of better quit rates, but *also* because of

product safety, affordability, ability to prevent cigarette cravings, or because one patch offers a program specifically for light smokers. (*Id.* at 204, 275; 4–23–03 H'g Tr. at 34–36, 49–50.) In contrast, "superior quitting efficacy" means only one thing: one patch is more successful than another at helping people quit smoking. On this motion Pharmacia seeks to prove that at trial it will likely be able to establish that "Revised Smart Choice" impliedly conveys a message of superior quitting efficacy, and that that message is false.

### i. *The Dupont Survey*

Pharmacia relies on a consumer perception survey conducted by Dr. Thomas E. Dupont ("Dupont") that found that "Revised Smart Choice" conveyed to consumers the claim that "using NicoDerm CQ results in superior quitting efficacy as compared to other nicotine patches, such as Nicotrol" ("the Dupont Survey"). (Pharm. PFFCL at 18.) The Dupont Survey utilized both open-ended and closed-ended questions in order to determine whether "Revised Smart Choice" conveyed a superior quitting efficacy message to consumers. (*Id.* at 18–19.) The Dupont Survey also employed two control mechanisms in order to prevent " 'yea-saying,' pre-existing beliefs and other types of 'noise' " from interfering with the survey results. (*Id.* at 20.) First, Dupont included two closed-ended questions asking about a skin irritation message conveyed by "Revised Smart Choice," even though the ad did not actually contain any such message. (*Id.*) The purpose of this control was to weed out "yea-sayers," respondents whose opinions are unreliable because they will say they saw anything in the commercial about which they are asked. (*Id.*) The surveys completed by any respondents who claimed to have viewed a skin irritation message were dis-

regarded from Dupont's final analysis of the data. (*Id.*)

Dupont's second control was designed "to test how many consumers . . . had a pre-existing belief that NicoDerm CQ was superior to other patches, rather than a belief of superiority caused by 'Revised Smart Choice.' " (*Id.* at 21.) Dupont testified that this control was necessary to ensure that the Dupont Survey accurately reflected the percentage of consumers who received the implied superiority message from "Revised Smart Choice," alone. (*Id.*) Toward that end Dupont showed a group of survey participants a different commercial, entitled "You're My Hero." (*Id.*) "You're My Hero" also advertises Nico-Derm, but the parties agree that "You're My Hero" contains no implicit superior efficacy claim. (*Id.*) Dupont then asked these participants the same questions he put to those who viewed "Revised Smart Choice." (*Id.*) 21% of participants shown "You're My Hero" found that it did have an implied claim of superior efficacy vis-a-vis other patches. (2–3–03 H'g Tr. at 53.) To control for this "noise," Dupont subtracted 21% from the percentage of participants who stated they had perceived an implied claim of superior efficacy in "Revised Smart Choice." (*Id.* at 54.)

The Dupont Survey was administered to 218 respondents who viewed "Revised Smart Choice" and 142 respondents who viewed "You're My Hero." (GSKCH PFFCL at 18.) Dupont asked all participants open-ended questions including, *inter alia,* "Please tell me, as completely as you can, what that commercial communicated to you?" and "What else, if anything, did the commercial communicate to you?

Anything else?" (*Id.* at 18–19.) He asked them closed-ended questions including, *inter alia,* "Did the commercial say or suggest there was any difference between Ni-coDerm CQ and another patch in terms of which one would be more effective at helping you quit smoking?" and, if the answer was "yes," "Which one did the commercial say or suggest would be more effective at helping you quit smoking?" (*Id.* at 19.) After application of the two controls to the results of these questions, the Dupont Survey ultimately concluded that between 30% and 55% of respondents perceived a claim of superior quitting efficacy from "Revised Smart Choice." (2–4–03 H'g Tr. at 56–59.)

### ii. *GSKCH's Response*

GSKCH, through its expert Dr. Michael Rappeport ("Rappeport"), takes exception to the controls employed by the Dupont Survey.[3] Specifically, Rappeport testified that Dupont's use of "You're My Hero" as a control commercial was ineffective because unlike "Revised Smart Choice," "You're My Hero" is not a comparative commercial. As a result, Rappeport told the Court, it is impossible to determine whether the Dupont Survey's findings reflect an actual implied superior quitting efficacy message, or instead the improper-ly-controlled-for message of implied supe-riority necessarily conveyed by any comparative commercial. (GSKCH PFFCL at 23–26.)

"You're My Hero" depicts a man and a woman sitting at a table following a meal. (*Id.* at 22.) The man states he has quit smoking, and the woman responds, "You're my hero." (*Id.*) The man then explains he is not a *super* hero, so he is

---

3. GSKCH also attacks the Dupont Survey on the grounds that (1) the closed-ended question on which it relied most heavily in reaching its conclusions was so ambiguous as to render the survey unreliable, and (2) Dupont misin-terpreted the meaning of the respondents' an-swers to the open-ended questions. Since we conclude, *infra,* that the survey evidence must be disregarded because Dupont did not prop-erly control for the effect of preexisting be-liefs, we need not address those arguments.

using NicoDerm to help him quit. (*Id.*) Superimposed text then appears reading "# 1 Doctor Recommended Patch." (*Id.*) An announcer explains that NicoDerm can be worn for 16 or 24 hours. (*Id.*) There is no mention of Nicotrol or any other patch in the commercial. (*Id.*)

Rappeport testified that a control commercial generally works by simulating the test commercial in every way except that it omits the allegedly false or misleading message the researcher is investigating. (*Id.* at 21–22.) If the two commercials are alike in every way except for the false or misleading message, then any difference in how respondents perceive the two commercials is due to the false or misleading message. (*Id.*)

Rappeport explained that "You're My Hero" is an improper control commercial for the Dupont Survey because unlike "Revised Smart Choice" it is not a comparative commercial. (*Id.* at 24.) "Revised Smart Choice" lines up two products, Nico-Derm and Nicotrol, against one another and compares them. According to Rappeport, when consumers view a commercial that explicitly compares two or more products, their own experience with advertisements has taught them that the message of the comparative commercial is generally that the advertised product is superior in some way. (*Id.*) That is, consumers naturally view any comparative commercial as making a claim of some kind of superior efficacy in relation to the product being disparaged. This belief, Rappeport continued, will likely be reflected in survey answers. (*Id.*)

Rappeport concluded that this improper control commercial undermined the reliability of the Dupont Survey. As he told the Court:

I think [using "You're My Hero" as the control commercial] makes the data impossible or close to impossible to be analyzed, effectively. You simply don't know what's being caused by the commercial, and what's coming from the noise and pre-conceptions, which is the purpose of the control, and absent that, you don't know how to analyze the data. (2–4–03 H'g Tr. at 40.)

### iii. *The Court's Findings*

The Court finds that it cannot credit the Dupont Survey because it does not adequately control for consumers' preexisting beliefs that comparative commercials imply *some* sort of superior efficacy. The Court first finds that "You're My Hero" is at most marginally comparative. The only arguably comparative statement in the control advertisement is that NicoDerm is the "# 1 Doctor Recommended Patch." The commercial makes no mention of any other patch, and certainly does not compare NicoDerm's attributes to those of another product. In contrast, the purpose of "Revised Smart Choice" is to compare Ni-coDerm and Nicotrol.[4]

The Court further finds that this difference between the control and test commercial is fatal to the evidentiary value of the Dupont Survey. Consumers view comparative commercials with a pre-existing belief that the commercial is making some kind of superior efficacy claim, and this belief must be controlled for in a survey seeking to establish that a particular comparative commercial ("Revised Smart Choice") is making a specific superior efficacy claim (a higher quit rate). The Court finds that failure to control for this pre-existing belief could have led some survey participants to report that "Revised Smart

---

4. The Dupont Survey itself supports this conclusion. Dupont asked all participants "Did the commercial compare NicoDerm CQ with another patch?" (GSKCH PFFCL at 19.) Approximately 92% of those who viewed "Revised Smart Choice" answered "yes," compared to only about 10% of those who saw "You're My Hero." (*Id.* at 23.)

Choice" claimed superior *quitting* efficacy because they perceived *some* message of superior efficacy, and quitting efficacy was the type suggested by the Dupont Survey, not because they actually perceived a superior quitting efficacy claim.

Dupont testified on cross-examination that he used the "You're My Hero" advertisement as a control in order to eliminate any pre-existing beliefs respondents may have had regarding "NicoDerm advertising in general communicating superior efficacy." (2–3–03 H'g Tr. at 95.) He stated that he did not believe he needed to use a control commercial with "a direct comparison with another brand," however, because past studies had shown that comparative commercials "don't *necessarily* communicate superior efficacy."[5] (*Id.* (emphasis added).) He continued that these studies showed that "the whole theory that people come to NicoDerm comparative commercials with an expectation that they're going to be communicating superior efficacy appears to be false *because sometimes they do and sometimes they don't.*" (*Id.* at 95–96 (emphasis added).)[6] The significance

of this testimony is that while Dupont disagrees with Rappeport as to whether consumers *always* believe comparative commercials make superior efficacy claims, he concedes that they do bring this pre-existing belief with them "sometimes." Dupont further testified that "[i]f respondents bring a belief that all advertising is communicating a superiority message, then I would want to back that out" of the survey. (*Id.* at 93–94.) Yet, by failing to employ another directly comparative advertisement, the Court finds that Dupont did not control for the presence of this preexisting belief, which he himself conceded is sometimes present.

The Court finds that due to this failure to control for preexisting beliefs the Dupont Survey does not establish that "Revised Smart Choice" conveys an implied message of superior quitting efficacy. The survey's results are compromised by the possible influence of the respondents' preexisting beliefs that comparative commercials convey superior efficacy claims.[7] Put differently, because of this control failure the Court cannot determine if consumers

---

5. Dupont also testified that he did not have access to any other commercials comparing NicoDerm to another product, so he could not have used one even if he had thought it appropriate. (2–3–03 H'g Tr. at 90–91, 100; 4–23–03 H'g Tr. at 126–27.) The Court disregards this excuse. Rappeport testified that experts conducting consumer surveys often create new ads or alter existing ones. (2–4–03 H'g Tr. at 39–40.) If Pharmacia wishes the Court to credit its survey evidence, that evidence must conform to generally accepted survey principles. Nothing prevented Pharmacia from designing its own mock comparative commercial for the purposes of the Dupont Survey.

6. Further, on direct testimony Dupont stated:
 MR. WILLIAMS: Do you have an opinion whether any and every comparative commercial in this product category will communicate a superior efficacy message?
 DR. DUPONT: I do.

MR. WILLIAMS: And what is that opinion?
DR. DUPONT: It is that some will and some won't.
(2–3–03 H'g Tr. at 63.)

7. As Dupont himself testified:
 [Y]ou have a belief that you bring with you to the commercial, and that—and then when you answer the questions in the questionnaire, it's those beliefs rather than what's in the commercial, or maybe it's those beliefs in concert with what's in the commercial that causes you to answer the survey questions the way you do, and so it's important to be able to know—you know, *if those preexisting beliefs exist, it's important to be able to back those out of the results, to have some estimate of what they are, and take them out, so that you have a measure of what the commercial communicated and not what the preexisting beliefs were.*
 (2–3–03 H'g Tr. at 38–39 (emphasis added).)

actually perceived a superior quitting efficacy claim in "Revised Smart Choice," or if they were led to perceive one that was not there as a result of their pre-existing biases.[8]

Judge Politan of this District reached nearly the same conclusion in *American Home Products*. There, one OTC analgesic manufacturer sued another for false advertising, and moved for a preliminary injunction. 871 F.Supp. at 742. The plaintiff alleged that the defendant's commercial impliedly claimed the superior efficacy of its analgesic, and that such claim was false. *Id.* at 746. In support of its allegation the plaintiff offered a survey finding that a substantial number of consumers found the commercial claimed that the defendant's analgesic had superior efficacy in relation to the plaintiff's. *Id.* at 749. The court, however, refused to enjoin the defendant's commercial because it concluded the plaintiff's survey failed to control "for the individual participant's preconceived notions concerning OTC analgesics and how those notions may have influenced her responses." *Id.* The court found that consumers may have held the pre-existing belief that the defendant's product was superior to the plaintiff's, and thus

> absent a valid noise filter, the Court is unable to discern if [plaintiff's] survey results are attributable to the advertisement or are instead attributable to consumers being bombarded with years of OTC advertising from which their pre-or misconceptions of these products have developed. Accordingly, the Court must

discount plaintiff's television commercial survey.

*Id.* at 762.

The same result obtains here. Both sides agree that survey participants sometimes bring with them the pre-existing belief that comparative commercials always claim superior efficacy on the basis of some product attribute. Pharmacia contends that this specific comparative commercial, "Revised Smart Choice," is claiming superior efficacy on one particular product attribute: quit rate. If a viewer of this commercial is predisposed to finding *some* claim of superior efficacy, and is then asked if she saw a *specific* claim of superior efficacy, her pre-existing beliefs may lead her to state she perceived that specific claim even where she did not. Failure to control for this possibility renders the Dupont Survey unreliable.

The Dupont Survey is the only evidence Pharmacia submits in support of its claim that "Revised Smart Choice" impliedly conveys a message of superior quitting efficacy. "As the Court has discounted the reliability of plaintiff's surveys, it is patent that plaintiff can adduce no proof, other than its mere contention, that consumers received any message[ ]" of superior quitting efficacy from GSKCH. *Id.* at 752.[9] The Court will not enjoin GSKCH from airing "Revised Smart Choice" on these grounds.

#### d. *"More Doctors Prefer the Patch That Gives You the Choice"*

 Pharmacia also alleges that "Revised Smart Choice" runs afoul of the Lan-

---

8. Pharmacia attempts to salvage the Dupont Survey by claiming that Dupont's control question is a sufficient safeguard against any "noise." (Pharm. Rep. PFFCL at 16.) As noted *supra*, however, the control question only weeds out the "yea-sayers." It does not protect the survey from the bias brought by consumers' pre-existing beliefs about comparative commercials.

9. Since we conclude that Pharmacia has not shown that consumers receive a superior quitting efficacy message, we need not determine whether Pharmacia has shown a likelihood that it can show that such a claim is false. *See Novartis*, 290 F.3d at 587.

ham Act because it makes the expressly false claim that doctors prefer NicoDerm over Nicotrol because NicoDerm offers the choice of being worn for either 16 or 24 hours. When the plaintiff makes a claim of literal falsity the Court must determine "first, the unambiguous claims made by the advertisement . . . , and second, whether those claims are false." *Novartis*, 290 F.3d at 586. An unambiguous claim can be explicit, or can be necessarily implied by the advertisement. *Id.* at 586–87. The Court must look at the commercial as a whole when making its assessment. *See, e.g., Rorer*, 19 F.3d at 129 ("A determination of literal falsity rests on an analysis of the message in context.").

We find that the words "more doctors prefer the patch that gives you the choice," when viewed in the overall context of "Revised Smart Choice," necessarily imply that doctors prefer NicoDerm over Nicotrol *because* NicoDerm offers consumers a 16–or 24–hour choice. As discussed *supra*, "Revised Smart Choice" is a directly comparative commercial, pitting NicoDerm against Nicotrol. The ad opens with an announcer stating: "You've decided to quit smoking. Smart choice. Now which patch? The one that leaves you little choice? Or NicoDerm?" (GSKCH PFFCL at 15.) It makes three claims of NicoDerm's superiority over Nicotrol. It claims NicoDerm alone offers a program for light smokers. (*Id.*) It claims NicoDerm can be worn for either 16 or 24 hours, while Nicotrol can only be worn for 16 hours. (*Id.*) And it claims that "more doctors prefer the patch that gives you the choice." (*Id.* at 15–16.) The commercial ends with a shot of the NicoDerm box as the announcer states: "NicoDerm CQ. The power of choice." (*Id.* at 16.) We find that the unmistakable message of this advertisement is that NicoDerm offers choices, while Nicotrol is inflexible.

When viewed in this context we cannot find that the words "more doctors prefer the patch that gives you the choice" *explicitly* claim that doctors favor NicoDerm because of choice. The language GSKCH employs is not causal, but rather descriptive: the patch that doctors prefer, the commercial says, is the same patch that offers choice. However, the Court is not bound by strictly formal interpretations of advertisements. Rather, if "considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated," the Court may find literal falsity. *Novartis*, 290 F.3d at 587.

We find that GSKCH's statement "will necessarily and unavoidably be received by the consumer" as a claim that doctors prefer NicoDerm over Nicotrol *because* it offers choice. *See id.* at 588. The commercial is dedicated to demonstrating the flexibility of NicoDerm and the benefits of "[t]he power of choice," in contrast to the limitations of Nicotrol's 16–hour–only format. Further, GSKCH's choice of words gives its intention away. While the commercial could have said doctors prefer "NicoDerm," or "the patch that offers a plan for light smokers," GSKCH chose to describe NicoDerm as "the patch that gives you the choice." In *Novartis*, the Third Circuit affirmed the district court's finding that the product name "Mylanta Night Time Strength" "is literally false by necessary implication because it conveys the unambiguous message that the product is specially formulated to relieve nighttime heartburn." *Id.* at 589. The same result obtains here: in an advertisement dedicated to NicoDerm's flexibility, GSKCH's conspicuous use of the word "choice" to describe the patch that "doctors prefer" necessarily implies that doctors prefer the patch because of this choice feature. Thus, we find that the unambiguous claim of "more doctors pre-

fer the patch that gives you the choice" is that more doctors prefer NicoDerm over Nicotrol because NicoDerm offers a choice of being worn for either 16 or 24 hours.

The next inquiry is whether this unambiguous claim is false. Normally, the plaintiff "has the burden to demonstrate that the defendant's advertising claim is false." *Id.* at 590. However, the Third Circuit announced in *Novartis* that "a court may find that a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect." *Id.* We find that GSKCH does not have any evidence to support its claim that doctors prefer NicoDerm over Nicotrol because it offers choice, and therefore that claim is per se false.[10]

GSKCH offers five studies to support its claim that doctors prefer NicoDerm because it offers choice. (GSKCH PFFCL at 38–40.) These surveys, however, do not substantiate GSKCH's assertion. The first two studies GSKCH offers are internet studies conducted by Market Measures/Cozint L.P. ("Market Measures"). (Lewis Dec., Exs. A & B.) The first survey asked doctors, *inter alia,* "Which, if either, of the following products would you prefer for your patients who are currently smoking 10 or more cigarettes a day? 1) A nicotine patch approved for 16–hour or 24–hour use; 2) A nicotine patch approved for 16–hour use; 3) No preference." (Pharm. PFFCL at 34.) 77% of respondents chose the first option. (GSKCH PFFCL at 39.) The Court finds that at best this survey demonstrates that doctors prefer *a* patch with choice, and it is also open to the interpretation that doctors prefer a 24–hour patch to a 16–hour patch. Neither of these results substantiates GSKCH's claim that doctors prefer NicoDerm over Nico-

trol because of the choice NicoDerm offers between 16–and 24–hour use.

The second Market Measures study also fails to support GSKCH's claim. This survey showed the boxes for NicoDerm and Nicotrol to a group of doctors, and asked: "Which of these products, if either, do you prefer for your patients who are currently smoking more than 10 cigarettes a day and are interested in quitting smoking?" (*Id.*) 45% preferred NicoDerm, and 11% preferred Nicotrol. (*Id.*) Again, the Court finds that the most this study demonstrates is that doctors prefer NicoDerm— it does not purport to explain *why* doctors have this preference.

GSKCH's three remaining surveys are similarly unsupportive. GSKCH's third piece of evidence is a December 2002 survey that asked doctors "What ONE brand of smoking cessation product do you recommend most often?" (*Id.* at 39–40; Fish Dec., Ex. 3.) NicoDerm was preferred over Nicotrol. (GSKCH PFFCL at 40.) Again, this survey does not tell us why doctors prefer NicoDerm. Finally, GSKCH offers two sources of market data indicating that NicoDerm is recommended by doctors more often than Nicotrol. (*Id.*) But, again, this data does not offer the reasoning behind the doctors' preferences.

We find that GSKCH has not one scintilla of evidence to support its claim that doctors prefer NicoDerm over Nicotrol because of NicoDerm's 16–or 24–hour choice. In *Novartis*, the Third Circuit affirmed the district court's finding that an advertisement's claim was false where the defendant "[did] not argue or present any evidence to show" that its claim was true. *Novartis*, 290 F.3d at 590. In this rare instance, where the defendant has made "a completely unsubstantiated advertising

10. Because we find that GSKCH's claim lacks any evidentiary support, we do not address Pharmacia's alternative contention that the

offending statement is an "establishment claim" that GSKCH has a burden to substantiate with survey results.

claim," the Court may find the claim to be false even "without additional evidence from the plaintiff to that effect." *Id.* Accordingly, we find GSKCH's unambiguous claim that more doctors prefer NicoDerm over Nicotrol because NicoDerm offers users a choice of wearing its patch for 16 or 24 hours is false. Pharmacia's demonstration that this claim in "Revised Smart Choice" violates the Lanham Act establishes a likelihood of success on the merits.

## II. *Irreparable Harm*

The Court, having found that Pharmacia has shown a likelihood of success on its claim that GSKCH's statement "more doctors prefer the patch that gives you the choice" violates the Lanham Act, proceeds to the irreparable harm inquiry. The movant, Pharmacia, must demonstrate that it will suffer irreparable harm if the injunction does not issue. Further, Pharmacia must show that the harm GSKCH will suffer if the Court enjoins it from airing "Revised Smart Choice" is outweighed by the harm to Pharmacia in the absence of an injunction.

### a. *Harm to Pharmacia*

█ Pharmacia can establish irreparable harm if it can "demonstrate[ ] a significant risk that [it] will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir.2000). The Third Circuit held in *Novartis* that "[i]n a competitive industry where consumers are brand-loyal, ... loss of market share is a potential harm which cannot be redressed by a legal or an equitable remedy following a trial," and thus meets the test for irreparable harm. *Novartis*, 290 F.3d at 596 (quotations omit-

ted). Additionally, a number of courts have held in Lanham Act cases that "[w]here the challenged advertising makes a misleading comparison or reference to a competitor's product, irreparable harm is presumed." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 129 F.Supp.2d 351, 367 (D.N.J.2000), *aff'd*, 290 F.3d 578 (3d. Cir.2002) (citing *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir.1988)). *See also Barmasters Bartending Sch., Inc. v. Authentic Bartending Sch., Inc.*, 931 F.Supp. 377, 386–87 (E.D.Pa.1996); *J&M Turner, Inc. v. Applied Bolting Tech. Prods.*, No. 95–2179, 1996 WL 32114, at *12 (E.D.Pa. Jan.26, 1996), *aff'd*, 96 F.3d 1433 (3d Cir.1996); *Performance Indus., Inc. v. Koos, Inc.*, No. 90–6435, 1990 WL 161253, at *6 (E.D.Pa. Oct.17, 1990). "The presumption is provided because courts assume that a false direct comparison necessarily harms the goodwill of the victimized firm, and therefore constitutes irreparable harm." *J&M Turner*, 1996 WL 32114, at *12.

█ "Revised Smart Choice" is a comparative commercial. *See supra.* Thus, to the extent that the law presumes irreparable harm in Lanham Act cases involving misleading comparative commercials, Pharmacia has met its burden on this issue.[11] However, we need not rest our decision on the presumption of irreparable injury, because the record demonstrates that Pharmacia faces a significant risk of loss of its market share due to "Revised Smart Choice." We find that Pharmacia's Nicotrol and GSKCH's NicoDerm are in direct competition in the NRT market. We find that "Revised Smart Choice" is aimed at reducing Nicotrol's share of the

---

11. We also note that in another phase of this litigation GSKCH itself has taken the position that irreparable harm should be presumed once a party has shown a likelihood of suc-

cess on a claim that a comparative commercial violates the Lanham Act. (GSKCH Rep. Br. in Supp. of GSKCH Mot. for Prelim. Inj. at 23.)

NRT market. (Pharm. PFFCL at 9–11; Mitchell Dec., Exs. 5–9.) We further find that GSKCH's own research demonstrates that a commercial nearly identical to "Revised Smart Choice" was effective at eroding Nicotrol's position in the market in 1996, and that this format was revived because GSKCH believed it would work just as well again. (Pharm. PFFCL at 52–53.) These findings establish a significant risk of harm to Pharmacia, because Pharmacia will likely lose market share if GSKCH is free to air "Revised Smart Choice." We hold that Pharmacia has met its burden for this element of the preliminary injunction inquiry.

### b. *Harm to GSKCH*

Pharmacia must also demonstrate that the potential harm it faces without injunctive relief outweighs the harm the defendant will suffer should an injunction issue. The Third Circuit reiterated in *Novartis* that "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis*, 290 F.3d at 596. The court therefore affirmed the district court's holding that "because [the plaintiff] has established a likelihood of success [on its false advertising claim], [the defendant] cannot claim any legal entitlement to any economic benefits resulting from such false advertising." *Novartis*, 129 F.Supp.2d at 369. Any financial loss caused by the injunction, the district court continued, "is self-imposed." *Id.* See also *Sweetzel, Inc. v. Hawk Hill Cookies, Inc.*, No. 95–2632, 1995 WL 550585, at *16 (E.D.Pa. Sept.14, 1995) ("The burden [of enjoining defendants' false advertising] on defendants is slight; defendants have no right to misrepresent . . . to gain a competitive advantage.").

We find the above analysis applicable to this case. To the extent GSKCH is injured by an injunction against showing "Revised Smart Choice," that injury was caused by GSKCH's own misconduct in making a false claim. The Court therefore discounts any such harm. The likely loss of market share Pharmacia faces without injunctive relief outweighs any harm to GSKCH caused by granting preliminary relief.

### III. *Public Interest*

The final factor in the preliminary injunction inquiry is whether "the public interest favors issuing the injunction." *Novartis*, 290 F.3d at 597. Pharmacia urges that there is a strong public policy against the dissemination of false and misleading advertising. The Court finds that the case law in the Third Circuit supports this contention, especially in the context of OTC drug advertising. *See, e.g., Novartis*, 290 F.3d at 597 (agreeing with "those district courts that have found that there is a strong public interest in the prevention of misleading advertisements, and this interest is particularly strong where over-the-counter drugs are concerned") (quotations omitted). Further, we observe that "where the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more toward granting the injunction." *Id.* See also *Advance Magazine Publishers Inc. v. Vogue Int'l*, 123 F.Supp.2d 790, 802 (D.N.J.2000) ("Once the likelihood of success on the merits and irreparable injury to plaintiff have been amply demonstrated . . . it will almost always be the case that the public interest will favor injunctive relief.") (quotations omitted).

There is a public consideration that counsels against granting an injunction, however. The public has a strong interest in free competition. *See Barmasters*, 931 F.Supp. at 387 (recognizing "the public's interest in free competition"); *RPF Holding Corp. v. Bedrooms Plus*, No. 88–5126 (CSF), 1988 WL 145361, at *6 (D.N.J. Dec.28, 1988) (noting "the public interest

in open and free competition among manufacturers"). The injunctive power of the courts should not be misused by manufacturers attempting to stifle the free market that is the cornerstone of our economy. Courts should therefore be wary of producers' pleas for injunctive relief against the advertisements of their close competitors.

We nevertheless find that "[t]he public interest in truthful advertising is obviously served by a court's prohibition of advertising that is plainly false." *Dentsply*, 132 F.Supp.2d at 326. Permitting GSKCH to continue to air its false claims would not serve the public interest in free competition; rather, "the public interest in free and fair markets is promoted by enjoining the offending activity." *Sweetzel*, 1995 WL 550585, at *16. We therefore hold that enjoining "Revised Smart Choice" because of its false claim that more doctors prefer NicoDerm over Nicotrol because NicoDerm offers choice is in the public interest.

**IV.** *Equitable Considerations*

Pharmacia has met its burden of establishing all four factors favoring preliminary relief. Accordingly, a preliminary injunction is appropriate in this case. GSKCH, however, argues that Pharmacia's own advertising precludes it from obtaining injunctive relief. Specifically, GSKCH asserts that Pharmacia has itself engaged in false advertising, and thus Pharmacia's motion should be denied under the doctrine of unclean hands.

■■■■ "The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the par-

ty seeks in respect to the litigation." *Highmark*, 276 F.3d at 174. The doctrine is applicable in Lanham Act cases. *Id.* However, courts do not apply the unclean hands doctrine just because plaintiffs have engaged in *some* inequitable conduct; rather, the inequitable conduct identified by the defendant must evince a very close nexus to the defendant's own misconduct that initially gave rise to the suit. *Id.* That is, the "plaintiff's conduct [must be both] inequitable and ... involve[ ] the subject matter of the plaintiff's claim." *Ciba–Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 855 (3d Cir.1984). Further, the defendant must do more than merely allege misconduct; there must also be a claim that the defendant was injured "as a result of the misconduct." *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, No. 91–6818, 1992 WL 13682, *11 (E.D.Pa. Jan.27, 1992), *aff'd*, 980 F.2d 723 (3d Cir. 1992). *See also Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 249 F.Supp.2d 463, 523 (M.D.Pa.2003).

GSKCH argues that Pharmacia comes before the Court with unclean hands because in an October 2002 press release Pharmacia stated that Nicotrol was the only 16–hour patch in the NRT market. (GSKCH PFFCL at 58; Pharm. Reply PFFCL at 28.) GSKCH contends that this statement (which, the Court finds, is false because NicoDerm is also approved for 16–hour use) should preclude Pharmacia from enjoining "Revised Smart Choice."

■■■■ The Court disagrees. First, GSKCH has not alleged that Pharmacia's statement caused it injury, which is a predicate to application of the unclean hands doctrine.[12] Second, even if GSKCH

---

12. GSKCH may contend that injury should be presumed, as Pharmacia's statement would constitute false advertising under the Lanham Act. However, to the extent injury is presumed in Lanham Act cases, that presump-

tion is limited to instances of directly comparative advertisements. *See Novartis*, 129 F.Supp.2d at 367 ("In contrast, where a false or misleading advertisement touting the benefits of a product is noncomparative and

had alleged harm, its unclean hands argument would still be inapposite because the nexus between Pharmacia's statement and GSKCH's claim in "Revised Smart Choice" is too remote. Pharmacia's claim that Nicotrol is the only 16-hour patch was made in a mere press release. The claim did not disparage NicoDerm. In contrast, "Revised Smart Choice"'s false claim directly attacks Nicotrol. Further, GSKCH's false statement was made in a recurring television commercial aimed at influencing millions of consumers. This is a far cry from a single press release. Pharmacia's one false statement "does not excuse [GSKCH's] current deceptive and misleading advertisements to the public." *Highmark*, 276 F.3d at 174.

## CONCLUSION

Pharmacia has established all four elements required for preliminary relief with respect to GSKCH's statement in "Revised Smart Choice" that "more doctors prefer the patch that gives you the choice." GSKCH has not shown that Pharmacia comes to the Court with unclean hands with respect to this claim. Accordingly, the Court will grant Pharmacia's motion to enjoin GSKCH from airing "Revised Smart Choice" because the commercial makes that false claim.[13]

Pharmacia has not established a likelihood of success on the merits for its other two Lanham Act claims. It has not shown

makes no direct reference to any competitor's product, ... harm is not presumed."). We find that Pharmacia's press release is not comparative. Accordingly, harm cannot be presumed.

**13.** The Court need not address GSKCH's argument that granting a preliminary injunction in this case would violate the First Amendment to the United States Constitution. GSKCH's objection was directed at Pharmacia's request that the Court broadly enjoin GSKCH from airing any advertisement that makes "a superior efficacy claim, express or

that GSKCH's claim in "Revised Tough Decision" is literally false. It has also not demonstrated that consumers perceived an implied message of superior quitting efficacy in "Revised Smart Choice." The Court will therefore deny Pharmacia's motion for an injunction to the extent asserted on these two grounds.

implied, about the NicoDerm CQ or Nicorette products." (GSKCH PFFCL at 61.) The narrow injunction the Court will issue, forbidding GSKCH from airing "Revised Smart Choice" only because of the commercial's false claim regarding doctors' preferences, does not offend the First Amendment. *See Novartis*, 290 F.3d at 598 (noting that injunctions on commercial speech do not violate the First Amendment where they are "narrowly tailored to cover only the speech most likely to deceive consumers and harm the plaintiff") (quotations omitted).